# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| ZENAIDA GONZALEZ, *INDIVIDUALLY AND AS ADMINISTRATIX AD PROSEQUENDUM OF THE ESTATE OF ALISON CHAVEZ*<br><br>    PLAINTIFF,<br><br>v.<br><br>NEW JERSEY DEPARTMENT OF CHILDREN AND FAMILIES, DIVISION OF CHILD PROTECTION AND PERMANENCY, AND ALLISON BLAKE, ANDREA MOODY, LUISA CORDERO, OLGA HUYNH, BRIGID EGWU-ONYEMA, DAVID HENNINGSEN, IN THEIR PERSONAL CAPACITY;<br><br>    DEFENDANTS AND<br>    THIRD-PARTY<br>    PLAINTIFFS<br><br>AND<br><br>KEAN UNIVERSITY, CHILD ADVOCACY RESOURCE ASSOCIATION, AND VICTORIA CARDA AND MONICA AVILA IN THEIR PERSONAL CAPACITY<br><br>    DEFENDANTS,<br><br>AND<br><br>DR. ANITA KISHEN<br><br>    THIRD PARTY<br>    DEFENDANT | Civ. No. 14-7932 (KM)(MAH)<br><br>OPINION |

1

**KEVIN MCNULTY, U.S.D.J.:**[1]

This opinion concerns several summary judgment motions filed in connection with a civil rights case. Alison Chavez, a sixteen-month-old child, died of an acute subarachnoid hemorrhage due to head trauma while in a foster home. Her death was described as a homicide by the Union County Medical Examiner in an autopsy report. No one has been criminally charged and it is not clear precisely what caused Alison's death, except that, as explained below, it is alleged in this action that she was being neglected or abused by her foster parents.

The plaintiff is Zenaida Gonzalez, appearing individually as Alison's mother and as Administratix Ad Prosequendum of Alison's estate. Plaintiff brings claims against a number of defendants, including Alison's foster

---

[1] Citations to certain items in the record will be abbreviated as follows.:

"DE" = Docket entry number in this case.

Am. Compl. = Plaintiff's Amended Complaint (DE 47)

TPC = Third Party Complaint (DE 74)

Kishen SOMF = Dr. Kishen's statement of material facts(DE 166-2)

DCF SOMF = DCF defendants' statement of material facts (DE 168)

CARAS SOMF = CARAS defendants' statement of material facts (DE 170)

Pl. DCFRSOMF = The first segment of plaintiff's counterstatement of facts against DCF defendants' statement of facts (DE 181-1)

Pl. CARASRSOMF = The first segment of plaintiff's counterstatement of facts against CARAS defendants' statement of facts (DE 182-1)

Pl. Supp. DCFSOMF = The second segment of plaintiff's counterstatement of facts against DCF defendants' statement of facts (DE 181-1)

Pl. Supp. CARASSOMF = The second segment of plaintiff's counterstatement of facts against CARAS defendants' statement of facts (DE 182-1)

DCF Resp. to Pl. Supp. DCFSOMF = The first segment of DCF defendants' response to plaintiff's counterstatement of facts (DE 186-1)

CARAS Supp. PLSOMF = CARAS defendants' response to plaintiff's counterstatement of facts (DE 185-1)

DCF Supp. PLSOMF = The second segment of DCF defendants' response to plaintiff's counterstatement of facts (DE 186-1)

parents. Primary responsibility, of course, lies with the foster parents, who were responsible for the safety and well-being of this pitiable child. And there is plenty of moral blame to go around. The main question here, however, is the extent to which public or quasi-public foster care authorities should be liable in damages. As to that issue, there are a number of countervailing immunity doctrines to ensure that the State is not impaired in its mission to aid children who lack caretakers.

The defendants relevant to this motion can be separated into two groups.

The first group, which I will call the "DCF defendants," consists of the New Jersey Department of Children and Families ("DCF"), Division of Child Protection and Permanency ("DCPP"), along with individual defendants Allison Blake ("Blake"), who served as Commissioner of DCF during the relevant time period, (Am. Compl. ¶ 4), and Andrea Moody, Luisa Cordero, Olga Huynh, Brigid Egwu-Onyema, and David Henningsen, who were Alison's DCPP caseworkers or caseworker supervisors, (*id.* ¶ 5.) Against the DCF defendants, Plaintiff brings claims based on negligence and *respondeat superior*, and claims under 42 U.S.C. § 1983 and the New Jersey Civil Rights Act. Plaintiff asserts that the DCF Defendants should have investigated Alison's foster placement, realized it was unsafe, and removed her from the foster parents' custody. (*See generally* Am. Compl.) The DCF defendants respond by claiming that they are protected by qualified immunity and several other immunities identified in the New Jersey Tort Claims Act.

The second group, which I will call the "CARAS defendants," consists of Kean University ("Kean") and the Child Advocacy Resource Association ("CARAS"), which was an entity situated within Kean's Social Work Department, as well as two individuals. (*Id.* ¶¶ 6–7.) CARAS has since been disbanded, but during the relevant period it operated as a nonprofit that recruited and trained Spanish-speaking foster parents to work with DCPP. (*Id.* ¶ 6.) Defendant Victoria Cerda was the director of CARAS, and defendant

Monica Avila was a Family Services Specialist for that entity. (*Id.* ¶ 8.)[2] Plaintiff brings claims against the CARAS Defendants under the same statutes and common law theories as she does against the DCF defendants. Like the DCF defendants, the CARAS defendants claim they are entitled to a variety of immunities.

The DCF defendants have filed a third-party complaint against Dr. Anita Kishen, M.D,[3] seeking contribution for any liability ultimately assigned to them as a result of Alison's death. (TPC, Count One.) Dr. Kishen is a medical doctor licensed to practice in New Jersey with offices located in Plainfield, New Jersey. (*Id.* ¶ 5.) The DCF defendants allege that Dr. Kishen, who examined Alison on two occasions and noticed bruising and abrasions on her body, should have contacted DCPP or the New Jersey State Central Registry Hotline to report that Alison was potentially being abused. (*Id.* ¶¶ 9–10, 13–16.) Dr. Kishen moves for summary judgment on the ground that the DCF defendants have not provided an expert who can establish that she breached a relevant standard of care in failing to recognize potential signs of abuse.

I **GRANT** the summary judgment motions of Dr. Kishen and the CARAS defendants. The summary judgment motion of the DCF defendants' motion is in large part **GRANTED**, but it is **DENIED** as to plaintiff's claims against defendants Luisa Cordero and Andrea Moody under Section 1983 and the New Jersey Civil Rights Act, which will go forward.

## I.    BACKGROUND

The following facts are not in dispute. Alison was born on July 15, 2011. (Am. Compl., Factual Allegations ¶ 2.) She is the youngest of five children born to the plaintiff. (*Id.*) Alison's father was removed from her home in August 2011

---

[2] Plaintiff also brings claims against Alison's foster parents, defendants Haizel Lazala-Krohn and Lucrecia Vega (the "foster parent defendants"), but the foster parent defendants have not filed motions relevant to this opinion.

[3] The DCF defendants' third-party complaint also asserts allegations against Al & Jeans Children First and Unique Day Care, Inc., who provided daycare for Alison and her siblings. The daycare facility has not filed any motions relevant to this opinion.

following an incident in which he, while intoxicated, spit in Alison's mother's face and threw the family's belongings around the house. (*Id.* ¶ 3.) Alison's father was ultimately deported to Mexico after he sexually assaulted Alison's mother in September of 2011. (*Id.* ¶ 4.) In August 2012, Alison's mother suffered a nervous breakdown following a burglary of the family's apartment. (*Id.* ¶ 6.) She attempted to commit suicide and was hospitalized. (*Id.*) DCPP intervened with the intention of protecting her children.

### A. DCPP Places the Children with the Foster Parents

On August 22, 2012, DCPP obtained temporary custody of Alison and the other children. (DCF SOMF ¶ 1.) On August 27, 2012, DCF Defendant Luisa Cordero, a DCPP caseworker, picked up the children from temporary resource placements and transported them to the foster home owned by Lazala-Krohn and Vega. (*Id.* ¶ 3.) The foster parent defendants had been licensed by DCF in September 2011, with CARAS as their sponsoring agency. (*Id.* ¶ 4.) The foster parent defendants' initial application for licensing requested foster placement of only one child between the ages of three and five; they left open, however, the possibility of up to four children. (Pl. DCFRSOMF ¶ 4; Pl. Supp. DCFSOMF ¶ 2.) DCF initially issued a four-child license, but increased the foster parents' capacity to six at CARAS defendant Cerda's request. (DCF SOMF ¶¶ 4–6.)

CARAS caseworker Avila performed CARAS's initial visit with the foster family and assisted them in completing their DCPP application. (Pl. Supp. CARASSOMF ¶ 1.) She stated in her deposition that she was the resource parent's contact person and that her main goal was to ensure that the foster parents would meet the requirements from DCF's office of licensing. (*Id.* ¶ 2.) She explained that the foster parents had two sets of children before Alison and her siblings arrived at the home. The first was a female child between 8 and 10 who was there for less than a month with no issues; the second was a group of three siblings who left the home following allegations that the foster parents had used inappropriate discipline techniques. (*Id.* ¶¶ 4–5.)

DCF caseworkers and CARAS caseworkers visited the foster home numerous times between August and October 2012, and held internal meetings during which they discussed Alison's mother's status and interaction with the children. (*See, e.g.,* DCF SOMF ¶¶ 9, 11–12.) Alison's mother met with Alison and her siblings seven times over the period of September 11, 2012 to October 26, 2012. (*Id.* ¶ 61.) CARAS representatives observed Alison in the foster home three times. (*Id.* ¶ 66.) CARAS defendant Avila visited the children in their home on a monthly basis. (Pl. Supp. CARASSOMF ¶ 13.) After one visit, she stated in an email that she believed the children were thriving and adjusting well to the new home, but noted that Alison lacked motor skills and would not make eye contact. (*Id.* ¶ 12.) She also noted that Alison struggled with motor skills, noticeable when she played with toys. (*Id.* at 14.)

The parties dispute whether DCF defendant Cordero and CARAS defendant Avila believed that the foster parents were up to the task of taking care of five children. (*Id.* ¶¶ 6, 9; DCF Supp. PLSOMF ¶¶ 9B; Pl. Supp. CARASSOMF ¶ 28; CARAS Supp. PLSOMF ¶ 28.) Ms. Cordero recalled in her deposition that when she first visited Alison and her siblings at the foster home, she reported to her supervisor that the foster parents appeared overwhelmed. (Pl. Supp. DCFSOMF ¶ 8.) By her second visit to the foster family, however, Ms. Cordero noted that Ms. Lazala-Krohn "was more into the swing of things," appeared "in control," and had developed a warm relationship with the children. (DCF SOMF ¶ 9; DCF Resp. to Pl. Supp. DCFSOMF ¶ 8.)

## B. Alison Strikes Her Head and Ms. Lazala-Krohn Does Not Take Her to a Doctor

According to Ms. Lazala-Krohn's deposition testimony, on September 27, 2012 she was giving one of Alison's siblings a bath and had left the other four children downstairs. (Pl. DCFRSOMF ¶ 20.) She heard a "boom," and when she went downstairs, she discovered Alison on the floor. (*Id.*) The children

explained that Alison's sister Sharon had moved a chair[4] Alison was sitting in, causing Alison to fall out of the chair and strike her head on a bookcase. (*Id.*) Ms. Lazala-Krohn called foster parent Vega's sister, Maria, who "has some medical experience." (*Id.*) Maria was concerned that Alison had a concussion, so she directed Lazala-Krohn to keep Alison awake. (*Id.*) According to Ms. Lazala-Krohn, the called Ms. Cordero the next day, on Friday, September 28, 2012, and left her a voicemail about the injury. (DCF SOMF ¶ 20.)

On October 1, 2012, Alison's foster parent, Ms. Lazala-Krohn, called DCF defendant Cordero to inform her that Alison had sustained an injury on September 27, 2012. (*Id.*) On that call, Lazala-Krohn explained that Alison had a bump on her forehead which had been improving, but which had turned her forehead complexion a greenish color. (*Id.*) Ms. Cordero advised the foster parent to make an appointment with a pediatrician as soon as possible. (*Id.*) Lazala-Krohn also called and informed Ms. Avila at CARAS about Alison's fall and head injury. (Pl. Supp. CARASSOMF ¶ 20.) Ms. Avila recalled being concerned that Lazala-Krohn had waited four days to call her and that she had not yet taken Alison to see a doctor. (*Id.* ¶ 21.) Ms. Lazala-Krohn did not inform Ms. Avila that Alison had developed two black eyes or give details indicating that the fall might have caused serious injuries. (*Id.* ¶ 23.)

The next day, October 2, Ms. Cordero received a call from the daycare center informing her that Alison had a bump on her forehead and two black eyes. (Pl. Supp. DCFSOMF ¶ 34.) Ms. Cordero immediately notified her supervisor, who ordered her to take Alison to the doctor right away. (*Id.*) Ms. Cordero then met with Ms. Lazala-Krohn and took Alison to the doctor. (DCF SOMF ¶ 21.) Cordero explained that earlier on October 2 she had spoken with Lazala-Krohn to inquire about Alison's doctor's appointment, and Lazala-Krohn told her that she had not yet made one; when she finally did make the appointment, it was for October 4. (*Id.* ¶ 22.)

---

[4] The chair was a child's chair, but still too big for Alison to sit in with her feet touching the floor. (DE 181-6, Lazala-Krohn Dep. Tr. T246:23–247:5.)

When Ms. Cordero took Alison to the doctor's office, the examining physician determined that Alison was alert and healthy. (*Id.* ¶ 23.) The doctor stated, however, that Alison should have been taken to the emergency room immediately following the incident. (*Id.*) Ms. Cordero then returned Alison to Ms. Lazala-Krohn and emphasized to her that Alison needed a follow-up appointment. (*Id.* ¶ 26.) Lazala-Krohn assured Cordero that one was already scheduled. (*Id.*) Cordero wrote a report regarding the incident which noted that the foster parent recognized that she had made a mistake by not taking Alison to the doctor and had assured Cordero that it would not happen again. (*Id.* ¶ 27.) It is a Level I violation for a foster parent not to take necessary emergency action upon a serious accident or illness occurring to a child in his or her care, and is a basis for termination of a foster home. (Pl. Supp. DCFSOMF ¶ 45.) A foster parent must comply with Level I requirements "to receive or maintain a license." (*Id.* ¶ 46.) Ms. Cordero recalled that Ms. Lazala-Krohn's failure to take Alison to the hospital was "was a red flag immediately" and a "huge concern," and that she reported it to her supervisor immediately. (*Id.* ¶¶ 36–37; DCF's Resp. to Pl. Supp. DCFSOMF ¶ 37a.) Lazala-Krohn, for her part, told Cordero "it will not happen again." (DCF's Resp. to Pl. Supp. DCFSOMF ¶ 31a.)

### C. Other Injury Reports

On September 25, 2012, DCF had been notified by the daycare defendants that Alison's sister Sharon had come to daycare with a "busted lip." (DCF SOMF ¶ 19.) The foster parents told the daycare that it was from a fight between Sharon and her brother. (*Id.*) The daycare provided an incident report to DCF and also noted Alison had a bad diaper rash. (*Id.*) The incident report was never included in Alison's case file, contrary to DCF's usual practice. (Pl. DCFRSOMF ¶ 19.)

According to transportation aides at DCPP, Alison's daycare provided them additional incident reports documenting injuries to Alison on one or two occasions (Pl. Supp. DCFSOMF ¶¶ 49, 53), but those reports were not included in Alison's file (*id.* at 58). In one report, the daycare identified a rash/chafing

around Alison's vagina, which can indicate sexual abuse, but that report was never brought to Ms. Cordero's attention. (*Id.* ¶¶ 71–72.) The daycare never reported any concerns of abuse or neglect to DCPP caseworkers. (DCF Resp. to Pl. Supp. DCFSOMF ¶ 63B.)

### D. Alison's Case is Transferred from DCPP's Middlesex County Office to its Union County Office

A few days after that incident, on October 10, 2012, the case of Alison and her siblings was ordered to be reassigned from the location at which Ms. Cordero worked, DCPP's Middlesex Central office, to DCPP's Union East office. (DCF SOMF ¶¶ 32, 34; Pl. DCFRSOMF ¶ 30.) Alison's case file was not actually reassigned to new caseworkers until October 23, 2012, almost two weeks later. (Pl. DCFRSOMF ¶ 30.) Her new caseworkers were David Henningsen and Mr. Henningsen's supervisor Brigid Egwu-Onyema. (*Id.* ¶ 39.)

During an initial review of Alison's case file, Mr. Henningsen and Ms. Egwu-Onyema discussed Alison's mother's history and noted that the children were observed as looking "skinny" during a September 14, 2012 visit by a law guardian. (DCF SOMF ¶ 39.) They did not discuss the daycare incident report or the incident where Alison fell out of the chair. (Pl. DCFRSOMF ¶ 40.) Egwu-Onyema and Henningsen both acknowledged that they did not review the full DCPP case file on Alison and her siblings, but did review the case summary, which is a four-page document. (DCF SOMF ¶ 41; Pl. DCFRSOMF ¶ 35.) The summary makes no mention of the September 27, 2012 fall or the incident reports from daycare, so it appears the caseworkers were unaware that those incidents had occurred. (Pl. Supp. DCFSOMF ¶ 98.)

Mr. Henningsen later testified in his deposition that the first time he ever reviewed Alison's entire file was the day that Alison died. (Pl. DCFRSOMF ¶ 41.) That was the point at which he learned about Alison's fall from the chair. (Pl. Supp. DCFSOMF ¶ 116.) He recalled being told by his casework supervisor, Brenda Taylor, that he would not "have to do any heavy lifting" on Alison's case. (*Id.* ¶¶ 94–96.) Taylor denies ever having said that. (*Id.*)

Mr. Henningsen visited Alison's daycare on one occasion, but did not collect information such as incident reports. He testified that he would collect such reports when he had "time to do it" and that he would not work past normal working hours or take work home on the weekend because he was not paid to do so. (*Id.* ¶¶ 124–25.)

**E. Alison is Evaluated by Dr. Kishen**

On October 16, 2012, Dr. Kishen evaluated Alison on a well visit. (DCF SOMF ¶ 38.) Dr. Kishen noted in her records that Alison had developmental delays, but did not identify any possibility of abuse. (Kishen SOMF ¶ 3.)

On October 24, 2012, Dr. Kishen saw Alison again, this time for a cough, congestion, and fever. (*Id.* ¶ 4.) Dr. Kishen noted on her chart that Alison was "Alert/not reactive very sad." (*Id.*) She also noted bruising on Alison's "R temporal area X2; small bruise on X1 shoulder and left shoulder area . . . . Small superficial abrasion on the upper lip URI/OM/bruise (probably accidental)." (*Id.*) Dr. Kishen noted that Ms. Lazala-Krohn explained the bruises occurred during "a party at home, [when] the baby was sitting in a chair and was carried by guests." (*Id.* ¶ 5.) Kishen noted that she had advised Lazala-Krohn to "keep Alison c [with] her when there people in the house" and also noted that she had "[c]alled lft message Mr. Dave [Henningsen] (case family worker[)]." (*Id.*)

The parties dispute why Dr. Kishen called Mr. Henningsen. Dr. Kishen said in her deposition that she called solely to get Alison's medical records. (DE 166-4, Dep. Tr. Dr. Kishen T68:19-69:3.) However, after Alison died, Dr. Kishen reportedly gave an inconsistent statement to DCF's Institutional Abuse Investigation Unit ("IAIU"). (Pl. DCFRSOMF ¶ 45.) According to the statement as recorded by the IAIU investigator, Dr. Kishen explained that she called because she was concerned about Alison's bruises, noting that Alison was barely mobile so it was unlikely that she had caused the injuries to herself. (*Id.*) The investigator recorded Dr. Kishen as stating that she wanted to speak with Mr. Henningsen because she was concerned about the bruises and suspected

abuse. (*Id.*) The investigator further recorded Dr. Kishen as saying that she did not call the child abuse hotline because she had called Mr. Henningsen directly. (*Id.* ¶ 46.) Dr. Kishen, for her part, denies having ever made those statements. (DE 166-4 Dep. Tr. Dr. Kishen T69:2–3.)

Mr. Henningsen received Dr. Kishen's voicemail the next day, and recalls that Kishen requested that he return her call when he was available to discuss a "non-urgent matter . . . about the Chavez Children." (DCF SOMF ¶ 44.) Dr. Kishen confirms that she characterized the call as non-urgent in her voicemail. (*Id.* ¶ 45.) Mr. Henningsen did not return Dr. Kishen's call; as he explained to IAIU investigators later, his feeling was that because the call was not urgent, he would "get to her when I get to her." (Pl. Supp. DCFSOMF ¶ 22.) The answering machine message for Mr. Henningsen's voicemail does not state his name or give any identifying information which would have indicated to Dr. Kishen that she had reached the correct voicemail box. (DCF's Resp. to Pl. Supp. DCFSOMF ¶ 25a.)

Mr. Henningsen brought the Chavez children to the Union County office on October 26, 2012 to meet with Alison's mother. (DCF SOMF ¶ 47.) He noticed that Alison had a small black and blue mark on her cheek. (*Id.* ¶ 48.) He asked Ms. Lazala-Krohn about the mark and she explained that Alison had fallen asleep in her bouncer. (*Id.*) Mr. Henningsen later explained that he was not concerned about the bruise, given that Alison lived in a home with five kids and four dogs, but he did make a note to follow up about the mark with Dr. Kishen. (*Id.*; DCF's Resp. to Pl. Supp. DCFSOMF ¶ 86a.)

On October 29, 2012, Superstorm Sandy made landfall in New Jersey. (DCF SOMF ¶ 49.) Mr. Henningsen did not regain access to his office until November 1, 2012. (*Id.* ¶ 50.) Use of DCPP cars was suspended until November 3, 2012. (*Id.*) Mr. Henningsen received a voicemail from the foster parent defendants stating that the foster home did not have power, and Ms. Cerda from CARAS emailed DCF to advise them of the same issue. (*Id.* ¶¶ 51–52.)

**F. Alison is Taken to the Hospital, Where She Dies**

The conditions which ended Alison's life manifested themselves around November 8, 2012. According to Ms. Lazala-Krohn, she gave Alison a bath and then carried her to her bedroom. (Pl. Supp. DCFSOMF ¶ 128.) Lazala-Krohn set Alison down on a blanket on the floor and then left to get her a towel. (*Id.* ¶ 129–131.) When she returned, Lazala-Krohn claims, Alison was shaking as though she was having an epileptic seizure. (*Id.* ¶ 131.) Lazala-Krohn called 911 and took Alison to the hospital. (*Id.* ¶ 132.)

Ms. Lazala-Krohn called Mr. Henningsen to tell him that Alison had "some sort of convulsion" and that she was taking Alison to the hospital. (*Id.* ¶ 54.) Henningsen contacted CARAS defendant Avila to tell her Alison was being transferred to the hospital. (*Id.* ¶ 55.)

Alison died that day. (*Id.* ¶ 56.) Her death was ruled a homicide by the Union County Medical Examiner, and the cause of death was identified as "acute subarachnoid hemorrhage due to head trauma." (*Id.* ¶ 57.) The medical examiner identified numerous bruises and injuries on Alison's body. (Pl. DCFRSOMF ¶ 57.) DCPP then removed Alison's siblings from the Lazala-Krohn foster home. (*Id.* ¶ 133.)

As mentioned previously, DCF's Institutional Abuse Investigation Unit investigated Alison's death. (DCF SOMF ¶ 59.) The IAIU recommended that Ms. Lazala-Krohn and Ms. Vega's foster home be closed. (*Id.* ¶ 60.) It concluded that there was substantial evidence that the foster parents had subjected Alison to physical abuse or neglect. (CARAS SOMF ¶ 34.) It determined that Lazala-Krohn's explanation that Alison spontaneously began suffering convulsions was inconsistent with the massive hemorrhagic bleed in Alison's brain and the herniation of her brain, which indicated the child had received numerous blows. (Pl. Supp. DCFSOMF ¶ 136.)

The IAIU report noted that the foster parents had failed to seek appropriate medical attention for Alison's fall from the chair and for her seizure-like activity. It also concluded that the foster parents did not

adequately explain Alison's bruises after the Halloween party. (Pl. DCFRSOMF ¶ 60.) The IAIU investigated the daycare facility but determined that Alison was not neglected while she was there. (*Id.* ¶ 64.)

Plaintiffs' expert identified evidence that Alison had undergone "months of ongoing systematic abuse." (CARAS SOMF ¶ 35.) He concluded that Alison had "sustained multiple blows to her head" and "soft tissue injuries to several areas on her legs, buttock and chest," which "strongly support[ed] the interpretation that Alison ha[d] been abused repeatedly, at least during the final two months of her life, for which records are available." (Pl. Supp. DCFSOMF ¶ 143.) He also found neglect in the form of severe diaper rash and severe dehydration when Alison was entered into the emergency room on the day of her death. (*Id.* ¶ 144.)

After Alison's death, the daycare facility turned over several accident reports which documented the daycare's discovery of numerous bruises on Alison's body. (DCF SOMF ¶ 65.) Only two of those reports had been provided to DCPP prior to Alison's death: the one which referred to Alison's diaper rash and the one which referred to Alison's sister Sharon's busted lip. (*Id.*) It appears the daycare had informed DCPP transportation aides, who are not defendants in this action, about other injuries which were documented in the daycare's accident reports. (Pl. Supp. DCFSOMF ¶¶ 45–58.) As noted previously, it appears that the transportation aides failed to communicate those reports to DCPP caseworkers.

## II.    PROCEDURAL HISTORY

Plaintiff filed a civil complaint in Union County Superior Court on November 7, 2014. (DE 1-1.) On December 22, 2014, DCF defendants removed the case to the United States District Court for the District of New Jersey, where it was initially assigned to Judge Hayden before being reassigned to me on March 12, 2015. (DE 11.) I denied the DCF and CARAS defendants' motion to dismiss on February 24, 2016 (DE 33), and plaintiff filed an amended complaint on June 7, 2016 (DE 47). DCF filed its third-party complaint against

Dr. Kishen and Alison's daycare, Al & Jeans Children First and Unique Day Care, Inc. ("Al & Jean's") on January 17, 2018. (DE 74.) I denied Al & Jean's motion to dismiss the third-party complaint on January 23, 2019. (DE 118; DE 119.)

The parties have now concluded fact discovery. The DCF defendants, CARAS defendants, and Dr. Kishen have filed motions for summary judgment. (DE 166; DE 167; DE 169.)

### III.   LEGAL STANDARD — MOTION FOR SUMMARY JUDGMENT

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *See Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. Cnty. of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998) (citing *Peters v. Delaware River Port Auth. of Pa. & N.J.*, 16 F.3d 1346, 1349 (3d Cir. 1994)). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex*, 477 U.S. at 322-23. "[W]ith respect to an issue on which the nonmoving party bears the burden of proof . . . the burden on the moving party may be discharged by 'showing' — that is, pointing out to the district court — that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth

types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist).

Unsupported allegations, subjective beliefs, or argument alone, however, cannot forestall summary judgment. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1988) (nonmoving party may not successfully oppose summary judgment motion by simply replacing "conclusory allegations of the complaint or answer with conclusory allegations of an affidavit."); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). Thus, if the nonmoving party fails "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial . . . there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322-23).

Moreover, the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson*, 477 U.S. at 247-48. A fact is only "material" for purposes of a summary judgment motion if a dispute over that fact "might affect the outcome of the suit under the governing law." *Id.* at 248. A dispute about a material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

## IV. DCF DEFENDANTS' MOTION FOR SUMMARY JUDGEMENT

The DCF defendants move for summary judgment, asserting that plaintiff's state and federal civil rights claims are barred by the doctrine of qualified immunity (*see* Section V.A), and that plaintiff's common law claims are barred by the New Jersey Tort Claims Act (*see* Section V.B).

**A. Civil Rights Claims Under Section 1983 and the NJCRA**

Plaintiff brings civil rights claims against the DCF defendants under 42 U.S.C. § 1983 ("Section 1983") and the New Jersey Civil Rights Act ("NJCRA"), N.J. Stat. Ann. § 10:6-1 *et se*. I conclude that most fail because of the doctrine of qualified immunity, but that the civil rights claims against defendants Cordero and Moody survive.

Section 1983 provides a civil action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, or any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights . . . secured by the Constitution . . . shall be liable to the party injured in an action at law . . . ." 42 U.S.C. § 1983. Similarly, the New Jersey Civil Rights Act permits a claim by any "person who has been deprived of any substantive due process or equal protection rights, privileges or immunities secured by the Constitution or laws of the United States, or any substantive rights, privileges or immunities secured by the Constitution or laws of this State . . . by a person acting under color of law." N.J. Stat. Ann. § 10:6-2(c).

"The doctrine of qualified immunity insulates government officials who are performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L.Ed.2d 396 (1982)). The U.S. Supreme Court has established a two-part analysis that governs whether an official is entitled to qualified immunity. *See Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151 (2001). That two-part analysis inquires as to (1) whether the facts put forward by the plaintiff show a violation of a constitutional right; and (2) whether the right at issue was clearly established at the time of the alleged misconduct. *Id.*; *James*, 700 F.3d at 679. Even if there are fact questions as to the first, constitutional-violation prong, the court is required to decide the

second, *i.e.,* whether the right was clearly established. *See Spady v. Bethlehem Area Sch. Dist.*, 800 F.3d 633, 638 (3d Cir. 2015) ("[W]hile issues of fact may preclude a definitive finding on the question of whether the plaintiff's rights have been violated, the court must nonetheless decide whether the right at issue was clearly established."). Because this is a motion for summary judgment, the court considers the facts in the light most favorable to the plaintiffs. *Couden v. Duffy*, 446 F.3d 483, 492 (3d Cir. 2006). The plaintiff must, nevertheless, establish that the defendants committed a constitutional violation to survive the first prong of the qualified immunity analysis.

The second prong of the analysis asks whether the right was so clearly established that the state actor should have known that he or she was committing a constitutional violation under the circumstances. The courts are not to define clearly established law at a high level of generality, *Thompson v. Howard*, 679 F. App'x 177, 182 (3d Cir. 2017), but neither is it necessary that the precise factual circumstances of a given case were previously considered. *Kelly v. Borough of Carlisle*, 622 F.3d 248, 259–60 (3d Cir. 2010) ("[O]fficials can still be on notice that their conduct violates established law even in novel factual circumstances, as long as the law gave the defendant officer fair warning that his [or her] conduct was unconstitutional.") (internal citations and quotations omitted).

## 1. Whether DCF and DCPP are "Persons" Under § 1983 and N.J. Stat. Ann. § 10:6-2

DCF and DCPP are not "persons" subject to suit under Section 1983 or the NJCRA. Summary judgment will be granted to them on those claims.

As for the federal civil rights claim, "States are not 'persons' within the meaning of § 1983 and, therefore, cannot be among those held liable for violations of the civil rights statute." *Blanciak v. Allegheny Ludlum Corp.*, 77 F.3d 690, 697 (3d Cir. 1996). "[S]tate agents and state instrumentalities," depending on the "nature of the entity created by state law," should be "treated as an arm of the State." *Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429–30 (1997). Thus, New Jersey state agencies, including NJDCPP, are immune

from suit except where their Eleventh Amendment immunity has been waived. *See O'Bryant v. NJDCPP*, 818 F. App'x 143, 147 (3d Cir. 2020) (NJDCPP immune from § 1983 liability).

The same is true under N.J. Stat. Ann. § 10:6-2(c), which mirrors the language of § 1983 and, for good measure, is accompanied by New Jersey's statutory definition of "person," which extends to the State only "when used to designate the owner of property which may be the subject of an offense." *Didiano v. Balicki*, 488 F. App'x 634, 638 (3d Cir. 2012). The Third Circuit has thus concluded that the New Jersey Civil Rights Act does not provide a claim against the State of New Jersey or arms of the State, such as DCF or DCPP. *Id.* at 638–39; *see also Evans v. City of Newark*, 2016 U.S. Dist. LEXIS 62070 at *23 (D.N.J. May. 10, 2016) (same).

Because DCF and DCPP are not eligible defendants under § 1983 or NJCRA, I grant summary judgment in DCF and DCPP's favor on the civil rights claims brought against them.

### 2. Constitutional claims against remaining DCF Defendants

The DCF defendants' summary judgment motion is denied, however, on the issue of whether two individual DCF defendants, Ms. Cordero and Ms. Moody, sued in their personal capacities, violated Alison's constitutional rights. As to the constitutional claims against the other individual DCF defendants, the summary judgment motion is granted.

### i. *Nicini v. Morra*

Plaintiff argues that under *Nicini v. Morra*, 212 F.3d 798 (3d Cir. 2000) the DCF defendants violated Alison's liberty interest in bodily integrity, protected by the substantive due process clause of the Fourteenth Amendment. (Pl's DCF Opp. at 5.) I agree.

*Nicini* involved a fifteen-year-old who was hospitalized after a suicide attempt. 212 F.3d at 801. DYFS representatives met the boy at the hospital after he told hospital workers that his father was physically abusing him. *Id.* DYFS placed Nicini in numerous foster homes, from which he repeatedly ran

away. *Id.* Ultimately, Nicini made his way to the home of Edward Morra. *Id.* at 802. The Morras were family friends with the Nicinis, and Nicini insisted that he wanted to live with them. *Id.* A DYFS worker performed a "PERP" check on the Morras, a procedure intended to uncover any criminal record of sexual abuse which occurred in New Jersey. *Id.* The PERP check did not reveal that the Morras had any criminal record, so the DYFS worker permitted Nicini to stay there temporarily. *Id.*

At a hearing in New Jersey state court, DYFS and Nicini's parents consented to Nicini's remaining with the Morras, although Nicini's mother suggested that he be monitored for drugs—a suggestion which was rejected by the presiding judge. *Id.* at 803–04. Approximately two weeks after the judge authorized Nicini to remain at the Morras' home, DYFS forwarded to the Morras an application for qualification as para-foster parents. *Id.*

Four days after DYFS sent the application, Nicini fled from the Morra home. *Id.* He later filed suit against Morra, DYFS, and DYFS workers, alleging that Edward Morra had been sexually abusing him and providing him drugs and alcohol. *Id.* Nicini alleged that DYFS and DYFS workers had failed to properly investigate Edward Morra before placing Nicini in Morra's care without a criminal background check, and that they had constructive knowledge that Edward Morra had provided Nicini with drugs and alcohol at his residence. *Id.*

An investigation revealed that Edward Morra had been convicted in New York for corrupting the morals of a minor and distributing controlled substances to minors. *Id.* That New York conviction, however, had not appeared on the PERP check, which was limited to records of abuse committed in New Jersey.

The Third Circuit considered whether Nicini had made out a violation of his constitutional rights. It noted that "in certain limited circumstances the Constitution imposes upon the State affirmative duties of care and protection with respect to particular individuals." *Id.* at 807 (quoting *DeShaney v. Winnebago County Dep't of Soc. Servs.*, 489 U.S. 189, 198 (1989)). It explained

that "[t]he state's affirmative 'duty of care and protection' in those cases stemmed 'not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf.'" *Id.* (quoting *DeShaney*, 489 U.S. at 198, 200). Thus, it concluded that "when the state places a child in state-regulated foster care, the state has entered into a special relationship with that child which imposes upon it certain affirmative duties. The failure to perform such duties can give rise, under sufficiently culpable circumstances, to liability under section 1983." *Id.* at 808.

The Court then identified "what level of conduct is egregious enough to amount to a constitutional violation." *Id.* at 809. It explained that such conduct must "shock the conscience," and that the "exact degree of wrongfulness necessary to reach the 'conscience-shocking level depends upon the circumstances of a particular case.'" *Id.* at 810 (quoting *Miller v. City of Philadelphia*, 174 F.3d 368, 375 (3d Cir. 1999). It concluded that in the foster care context, at least when a caseworker has the time "'to make unhurried judgments' in investigating whether to permit [a child] to remain" in a home, conduct that is "deliberately indifferent" will shock the conscience. *Id.* (quoting *Lewis*, 523 U.S. 833, 853 (1998)). It defined "deliberate indifference" as encompassing those instances where an "official knows of and disregards an excessive risk to . . . health and safety" and is both "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and "also draw[s] the inference." *Id.* (quoting *Farmer v. Brennan*, 511 U.S. 825, 837 (1994)).

Applying those standards, the Court concluded that DYFS had not been deliberately indifferent to Nicini's safety. Nicini could not point to any DYFS policy or procedure, or any state requirement, which DYFS or its employees had violated. *Id.* at 813. It rejected Nicini's assertion that DYFS should have been on notice that a more extensive investigation of the Morras was necessary, noting that DYFS employees had consistently monitored the home, sending a

worker there as soon as Nicini's whereabouts were identified, doing two follow up visits in the next nineteen days, and keeping in telephone contact. *Id.* A DYFS outreach counselor had visited the home once a week and concluded that Nicini was doing well there. *Id.*

Also significant to the decision was Nicini's failure to tell DYFS workers about the sexual assaults when they visited. *Id.* Nicini, although a minor, was fifteen, and thus "not of such tender years that he was unable to communicate" the fact of the sexual assaults. *Id.* Nicini, who had left earlier placements to seek out the Morras on his own, had not told his attorney or the court about the assaults when he testified at the hearing confirming his placement with the Morras. *Id.* The Court concluded that DYFS could not have reasonably inferred that Nicini faced a substantial risk of harm, in light of Nicini's insistence on remaining in the Morra home and DYFS workers' firsthand impressions that Nicini was doing well there. *Id.* at 813–14.

*Nicini* expressly left a number of questions unanswered. First, the Court noted that it could have applied a "professional judgment" standard rather than a "deliberate indifference" standard, though it acknowledged that the two tests would be similar. *Id.* at 811 n.9. Second, it allowed that, although *Farmer* had required proof that a state actor actually knew of the risk in question, an allegation that the official "should have known" might have been enough to establish deliberate indifference. *Id.* at 811. Third, it did not resolve whether "failure to perform a specific duty can ever amount to deliberate indifference." *Id.* at 812.

### ii. Whether the individual DCF defendants were "deliberately indifferent" to risks to Alison's health or safety

Plaintiff identifies a number of the DCF defendants' failures which she asserts constitute deliberate indifference: (1) All five children were placed in the foster home despite the fact that the foster parents had initially applied to foster only one child; (2) When Ms. Cordero initially dropped the children off, she had the impression that the foster parents were overwhelmed; (3) Cordero did not remove the children from the home or launch an investigation after

21

Alison hit her head while falling out of a chair; (4) DCPP transportation aides did not transmit certain incident reports from the daycare to the caseworkers; (5) certain incident reports from the daycare were never entered into Alison's file; (6) Mr. Henningsen and Ms. Egwu-Onyema were not actually assigned Alison's file for two weeks after it was transferred from Middlesex County to Union County; (7) Henningsen and Egwu-Onyema read only the case summary, and did not read Alison's full case file until after she died; (8) Henningsen did not collect incident reports from the daycare facility when he visited it; (9) Henningsen did not act on the call from Dr. Kishen; (10) Henningsen took no action based on a small bruise on Alison's cheek which Ms. Lazala-Krohn told him resulted from Alison's having fallen asleep in a bouncer.

### a. Claims (1), (2), and (4) through (10)

I set aside Claim 3 for the moment and consider the others, which reflect no credit on anyone involved, but do not rise to the level of deliberate indifference.

Claim 1: That the foster parents initially asked for a smaller number of children does not mean they were incapable of caring for the larger number. I cannot conclude from this fact that DCF employees "knew" or even "should have known" that the number of children in the household posed an excessive risk to health and safety. *Nicini*, 212 F.3d at 805. Furthermore, the foster parents soon agreed to take on four children and do not appear to have objected to DCPP raising their limit to six. Whatever their initial misgivings, the parents did not seem, overall, to be communicating unwillingness or inability to take on a group of children.

Claim 2: While Ms. Cordero concluded from her first visit that Ms. Lazala-Krohn was overwhelmed by the children's arrival, by the second visit Lazala-Krohn appeared to be in charge and successfully managing the children. (DCF Resp. to Pl's Supp. DCFSOMF ¶ 9B.) It would be natural for a person abruptly put in charge of five unfamiliar children to experience a short period of adjustment; that does not suggest, let alone establish, that Ms. Cordero "knew" or "should have known" that leaving the children with Lazala-

Krohn would expose them to an excessive and unjustifiable risk to their health or safety.[5]

Claim 4: I cannot conclude that the DCF transportation aides' failure to transmit incident reports to Alison's caseworkers constitutes deliberate indifference. The transportation aides are not defendants in this action, and § 1983 liability depends on personal responsibility. *Rode*, 845 F.2d at 1207. Plaintiff brings no allegations indicating that any defendant in this case knew of the transportation aides' failures or caused them to fail to transmit the reports.

Claim 5: The failure to enter incident reports into Alison's casefile is insufficient to establish deliberate indifference. Plaintiff fails to identify who neglected to enter those reports into the file, so there is no evidence that any named defendant had "personal involvement in the alleged wrong." *Id.* Without knowing who was responsible for the failure to enter the reports, I cannot find that this was evidence of deliberate indifference on the behalf of any of these defendants. Nor does plaintiff provide any facts indicating that the anonymous person who failed to enter the reports into Alison's file "knew" or even "should have known" that failing to do so would subject Alison to a serious risk to her health or safety.

Claims 6, 8, 10: That it took two weeks for Alison's case file to be reassigned to Mr. Henningsen and Ms. Egwu-Onyema after the file was transferred to Union County falls short of establishing deliberate indifference. Plaintiff does not identify any individual defendant who was responsible for assigning the file in a more timely fashion, and provides no facts which indicate that the person, whoever it was, knew or should have known that failure to assign the file would subject Alison to a serious risk to her health or safety. The

---

[5]    Plaintiffs also bring claims against Olga Huynh, who was initially designated as Alison's permanent caseworker but who was out on maternity leave during all of the events relevant to this lawsuit. (Pl. Supp. DCFSOMF ¶¶ 53, 94.) Ms. Huynh played no role in this case, so the claims against her are dismissed. *Rode v. Dellarciprete,* 845 F.2d 1195, 1207 (3d Cir. 1988) ("A defendant in a civil rights action must have personal involvement in the alleged wrongs").

same is true of Mr. Henningsen's alleged failure to obtain incident reports from the daycare center when he visited; because he was not on notice of any serious risk to Alison, he did not disregard an excessive risk by failing to obtain said reports. Nor would a small cheek bruise, plausibly attributed to contact with a bouncer seat, change the picture.

Claim 7: The failure of Mr. Henningsen and Ms. Egwu-Onyema to read the entire case file was perhaps negligent, but does not establish deliberate indifference. The summary case file did not include any red flags, such as Alison's fall from the chair or relevant incident reports from daycare. Henningsen and Egwu-Onyema thus would not have been aware of any excessive risk to Alison which would have required them to read the case file more deeply and potentially investigate the foster home or remove Alison.[6]

Claim 9: Mr. Henningsen's failure to return Dr. Kishen's phone call does not establish deliberate indifference. It is not disputed that Dr. Kishen left Mr. Henningsen a voicemail stating that the call was not urgent. Whether or not *Dr. Kishen* should have identified the risk of abuse or neglect, *see* Section V, *infra*, there is no evidence that the doctor's phone call communicated any such concerns to Henningsen.[7]

---

[6]     It is a closer question whether Mr. Henningsen or Ms. Egwu-Onyema *should have* known that failing to read the case file would have exposed Alison to a risk. The parties disagree as to whether Henningsen and Egwu-Onyema were under a duty to read more than just Alison's case summary. As explained in Section IV.A.3, *infra*, however, a claim of deliberate indifference based on a "should have known" standard is not clearly established law and could not form the basis for a Section 1983 violation; indeed, based on *Nicini*'s equivocation as to whether the fact that a defendant "should have known" about abuse is sufficient to establish deliberate indifference, and the near unanimous agreement among other circuits that a plaintiff must prove actual knowledge, *see id.*, *infra*, I likely would reject a "should have known" claim on its merits without reaching the "clearly established" prong of qualified immunity.

[7]     Mr. Henningsen's failure to respond to what was expressly identified as a "non-urgent" call may also be explained, in part, by the arrival a few days later of Superstorm Sandy, which roiled the entire state and knocked out electrical power for New Jersey residents.

The Court must observe that Mr. Henningsen seems to have given some rather flippant responses in his deposition, particularly given the subject matter of this case.

### b. Claim (3)

I do conclude, however, that Plaintiff has set forth sufficient facts, based on Claim 3, to set forth a deliberate indifference claim against Ms. Cordero and her supervisor, Ms. Moody. There is evidence, interpreted in the most plaintiff-favorable light, that Ms. Cordero knowingly disregarded an excessive risk when she failed to remove Alison from the foster home after Alison suffered the head injury on September 27, 2012, or thereafter.

Ms. Cordero learned that Alison had suffered an injury in the foster home, severe enough to leave her with two black eyes and a greenish bump on her forehead. She learned that the injury occurred while Ms. Lazala-Krohn had left Alison, a sixteen-month old child who was barely mobile, alone in a chair.[8] She further learned that the chair was positioned in a playroom near enough to a bookcase that a child could fall out of the chair and hit her head. These conditions indicate that Ms. Lazala-Krohn, the foster parent, was either indifferent to or incapable of properly identifying such risks to Alison's well-being; there is at least a triable issue as to whether a sixteen-month-old with apparent developmental delays, who was not mobile, should be left alone in such a chair.

Ms. Coredero's knowledge of that failure alone might not have justified a conclusion of deliberate indifference in failing to remove the children from the household. Parents make mistakes, and a single mistake might not preclude a second chance.

---

He stated, for example, that he would "get to her when [he] got to her," that he would collect reports when he had "time to do it," and that he did not take work home on the weekend or after hours because he was not paid to do so. I cannot determine whether this evinced a hostile attitude toward counsel, a lack of professional commitment, or the frustrations of an overworked civil servant in a thankless and underfunded position. While the tone of the remarks is not to be commended, there is still a lack of actual evidence that Henningsen disregarded an excessive risk in this case.

[8]     Ms. Lazala-Krohn described the chair as a "small," "very low" chair, but noted that Alison's feet did not touch the ground while she sat in it. (DE 181-6, Lazala-Krohn Dep. Tr. T246:23–247:5.) It is not clear whether Ms. Cordero inquired about the size of the chair or questioned why Alison would have been left alone in it.

Ms. Lazala-Krohn, however, persisted in such mistakes or misjudgments. First, she did not respond to Alison's injury appropriately. Lazala-Krohn called her partner's sister, Maria, who "has some medical experience," to ask what to do about Alison's injury. Maria, who did not evaluate Alison, told Lazala-Krohn that she was concerned about a concussion and directed her to ensure that Alison stayed awake. Faced with the possibility that a sixteen-month old in her charge might have a concussion, Lazala-Krohn still did not take Alison to the hospital or schedule a doctor's appointment. She did not even call Ms. Cordero until the next day.

It is not clear from the record precisely when the two black eyes and a greenish bump on Alison's forehead became apparent. They were significant enough, however, to alarm Alison's daycare providers and cause them to call Alison's DCPP caseworker. Ms. Lazala-Krohn, faced with alarming symptoms that she knew were the result of Alison's hitting her head with a loud "boom," still did not take her to the hospital or follow up on her call to Ms. Cordero or Ms. Avila.

On October 1, four days later, Ms. Lazala-Krohn finally spoke to Ms. Cordero and explained that Alison continued to exhibit injuries from the fall. Cordero instructed her to take Alison to a doctor as soon as possible. Lazala-Krohn, now faced with a direct instruction from her DCPP caseworker, did not do so; she did not even schedule a doctor's appointment.

Ms. Cordero learned the following day—from the daycare center, not Ms. Lazala-Krohn—that Alison had not been taken to the doctor and that she had a serious injury which had caused her to develop two black eyes. Cordero then took Alison to the doctor herself, after being ordered to do so by her supervisor. The doctor informed Cordero that Alison should have been taken to the emergency room immediately following the incident.[9]

---

[9] Ms. Cordero downplayed the injury in her deposition, claiming it "wasn't even a bump, it was like greenish, a little mark on her forehead and she didn't have black eyes, it was just like little marks, like it seems like it was already healed." (Cordero Dep. Trans. T95:20–24.) Plaintiff claims it was a serious injury, and the daycare felt

The facts then known to Ms. Cordero put her on notice that Ms. Lazala-Krohn's foster parenting posed an excessive risk to Alison's health and safety. A jury could find that Lazala-Krohn displayed poor judgment in leaving Alison alone in a position where she could be injured. It could find that she then showed dangerously poor judgment, bordering on recklessness, by failing to take Alison to the hospital immediately after that ignored risk materialized. It could further find that recklessness hardened into obstinacy and an unwillingness to conform her behavior to the proper standard of care, as she failed to take Alison to the doctor's office even after Ms. Cordero instructed her to do so. From these facts, a jury could infer that Ms. Cordero should have realized that Ms. Lazala-Krohn's continued stewardship posed a serious danger to Alison's health. Indeed, Cordero herself contemporaneously identified these facts as a "red flag immediately" and a "huge concern," establishing that she was both "aware of facts from which the inference could be drawn that a substantial risk of harm exists," and also, in fact, did "draw the inference." *Nicini*, 212 F.3d at 810.

A jury could reasonably find, therefore, that Ms. Cordero, faced with these facts about Ms. Lazala-Krohn's failure to abide by a reasonable standard of care and refusal to conform to that standard after being reprimanded, should have removed Alison from the home immediately. A jury could also conclude that, had Ms. Cordero removed Alison from the home, Alison might have survived. Of course, the jury might reject those possibilities; these are not the only reasonable inferences to draw from these facts. On summary judgment, however, I ask only if a jury could reasonably come to that conclusion, and I conclude that it could.

DCF responds that Ms. Cordero did not exhibit deliberate indifference because she immediately took Alison to the doctor for evaluation upon learning about the injury. DCF also points out that the doctor concluded "that Alison

---

the injury warranted a call to DCPP. I therefore find a material dispute of fact on this factual point which forecloses its resolution on summary judgment.

was okay and did not report any concerns," and that Cordero explained to Lazala-Krohn that she needed to seek medical care for Alison in response to such incidents. (DE 186 at 5.) This analysis omits a number of key considerations.

First, Ms. Cordero's alleged failing was not that she did not take proper care of Alison. The problem is that that she did not intervene to take Alison away from Ms. Lazala-Krohn, whose behavior had put the child at risk. Cordero was obligated not only to properly respond to Alison's medical needs, but to actively ensure that Lazala-Krohn, the primary custodian, was responding properly as well.

Second, Ms. Cordero had already once told Ms. Lazala-Krohn to take Alison to the doctor on October 1, when she first learned of the injury. Lazala-Krohn told Cordero that she would do so, but never did. A factual issue therefore arises as to the reasonableness of relying on Lazala-Krohn's assurances that she would take Alison to the hospital in the future. A reasonable case worker might look beyond words for some overt sign that something had changed about Lazala-Krohn's attitude or practices. Again, a jury might conclude that Ms. Cordero acted properly, but there is enough evidence to permit an inference that she did not.

That the doctor found Alison "okay" and did not suspect actual abuse does not inoculate Ms. Cordero from liability. Again, Cordero is not faulted for denying medical care herself, but rather for leaving Alison in the care of an unfit foster parent. Alison hit her head on a bookcase with a "boom," and the emergency room doctor criticized Lazala-Krohn's failure to take Alison to a doctor immediately. Alison's daycare was so worried about Alison's black eyes that they called Cordero to report their concerns. A jury could conclude on those facts that Alison was exhibiting symptoms which required at least an emergency trip to a doctor, and that Cordero knew Lazala-Krohn had failed to act appropriately under the circumstances. That a doctor ultimately concluded that Alison was "okay" does not entail that Lazala-Krohn exercised appropriate

judgment and care. Because Ms. Cordero knew all of these facts and did not act, a jury could conclude she was deliberately indifferent.

I further find that Ms. Moody could be found liable on these same facts. The parties agree that when Ms. Cordero learned from the daycare that Alison had serious injuries, she was instructed by Ms. Moody to take Alison to the doctor's office immediately. (DCF Resp. to Pl. Supp. DCFSOMF ¶ 21.) Ms. Moody thus knew of the injury, and knew that Lazala-Krohn could not be relied upon to take Alison to the doctor's office; that is why she instructed Ms. Cordero to do it instead. Ms. Moody's liability, then, stems from her "participat[ion] in violating" Alison's rights and her "knowledge of and acquiesce[nce]" of Ms. Cordero's purported violations. *Barkes*, 766 F.3d at 316.

### 3. Whether a Constitutional Violation was "Clearly Established"

Having found a constitutional violation, *i.e.,* a triable case that Ms. Cordero and Ms. Moody were deliberately indifferent to the risks facing Alison in her foster home, I turn to whether such a constitutional violation was "clearly established" at the time.

#### i. Defining a clearly established right

The "clearly established" prong of the qualified immunity analysis "shields officials from civil liability so long as their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person should have known.'" *James v. N.J. State Police*, 957 F.3d 165, 169 (3d Cir. 2020) (quoting *Mullenix v. Luna*, 577 U.S. 7, 11 (2015)). "Clearly established means that, at the time of the officer's conduct, the law was sufficiently clear that every reasonable official would understand that what he is doing is unlawful." *Id.* (quoting *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018)). The inquiry is "an 'objective (albeit fact-specific) question,' under which '[an officer]'s subjective beliefs . . . are irrelevant.'" *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).

"In rare cases, a plaintiff may show that a right is clearly established if the 'violation [is] obvious'" from the application of a general rule to the

29

circumstances at hand. *Id.*; *see also Brosseau v. Haugen*, 543 U.S. 194, 199 (2004). In "most cases," however, "a plaintiff must show that a right is clearly established because 'the violative nature of *particular conduct* [was] clearly established." *James*, 957 F.3d at 169 (quoting *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1866 (2017)) (emphasis in original). In such cases, "settled law" must "squarely govern[] the specific facts at issue," *id.* (cleaned up), such that the plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant officer] was held to have violated the [constitutional provision at issue]." *White v. Pauly*, 137 S. Ct. 548, 552 (2017); *see also James*, 957 F.3d at 169–70. Such settled law may be drawn from "binding Supreme Court and Third Circuit precedent or from a 'robust consensus of cases of persuasive authority in the Courts of Appeals.'" *James*, 957 F.3d at 170 (quoting *Bland v. City of Newark*, 900 F.3d 77, 84 (3d Cir. 2018)). Thus, the court "first look[s] to factually analogous precedents of the Supreme Court and the Third Circuit" and then "examine[s] persuasive authorities, such as . . . nonprecedential opinions and decisions from other Courts of Appeals." *Id.*

What constitutes a "factually analogous" precedent or sufficiently "similar circumstances" may depend on the level of generality at which the right in question is defined. In *L.R. v. School District of Philadelphia*, for instance, the Third Circuit considered a Section 1983 claim against a kindergarten teacher who let a child leave the classroom with an unidentified woman, who later sexually assaulted the child. 836 F.3d 235, 248 (3d Cir. 2016). The court rejected as too broad a formulation of the clearly established right as the child's "right to bodily integrity . . . under the state-created danger theory." *Id.* at 248–49. Focusing more narrowly, the court ruled that "[i]n light of the specific allegations in the complaint . . . the right at issue here is an individual's right not to be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other facts, be especially vulnerable to the risk

of harm." *Id.* The *L.R.* court found "analogous circumstances" in cases where police officers arrested a drunken woman's husband and abandoned her, or where EMTs told police officers that a man had assaulted them without telling the officers the man had suffered a seizure. *Id.*; *see also id.* at 249–50 (other analogous cases included one in which police had arrested a man for drag racing and then left his children in the car by the side of the highway, and one in which the police arrested a driver in a high-crime area and left his female passenger in the car).

Also important to the analysis is whether the principle in question has ever been applied in a similar context. In *Mann v. Palmerton Area School District*, 872 F.3d 165, 174 (3d Cir. 2017), for instance, the court distinguished the classroom context of *L.R.* from the "school athletic context," finding that *L.R.* did not clearly establish that a football coach violated the constitution by permitting a student athlete to continue playing after sustaining a violent hit and exhibiting concussion symptoms. *Id.* at 174. Furthermore, even analogous circumstances and a similar context may be undermined by other factual distinctions, resulting in a finding that they do not "clearly establish" the relevant right. *Fields v. City of Philadelphia*, 862 F.3d 353, 361–62 (3d Cir. 2017) (decisions of other appellate courts finding that individuals have right to record police were distinct because they involved an "expressive intent or intent to distribute" and *Fields* did not).

Nonbinding but persuasive authority may "clearly establish" a right so long as it represents such a "robust consensus" that places the right in question "beyond debate." *Id.* at 361. But here, too, such decisions may not clearly establish a violation if they are doctrinally relevant but sufficiently distinguishable on their facts. *Id.* at 361–62. Finally, though less significantly, "[d]istrict court decisions, though not binding, also 'play a role in the qualified immunity analysis.'" *Id.* at 361 (quoting *Doe v. Delie*, 257 F.3d 309, 321 n.10 (3d Cir. 2001)).

ii.  **Application**

I begin, then, with binding relevant decisions of the Third Circuit. Recall that *Nicini*, discussed above, concluded that the state violates a foster child's right if it failed to protect the child from a known substantial risk of serious harm. *See* 212 F.3d at 811. Under *Nicini*, decided in 2000, foster children have a right, enforceable against state actors, to be free of abuse or neglect by their foster parents when the state knows of a substantial possibility that the abuse is occurring. In my judgment, that definition establishes the proper "level of generality" at which to determine whether the rule was clearly established.[10] *Nicini* clearly stated the principle that state actors in the foster system are subject to liability if they are deliberately indifferent to the child's wellbeing, specifically where they ignore a known substantial risk to a child. *See* Section IV.A.2.i, *supra*. It specifically dealt with an instance in which a child was abused by the equivalent of a foster parent, which renders it quite similar to this case.

---

[10]  It also corresponds to the later holding in *L.R.,* decided after the relevant events, in 2016. 836 F.3d at 248–49 (defining right as "an individual's right not to be removed from a safe environment and placed into one in which it is clear that harm is likely to occur, particularly when the individual may, due to youth or other factors, be especially vulnerable to the risk of harm.").

As support for Alison's clearly established right not to be abused or neglected while in foster care, plaintiff cites five cases from within this Circuit, but only *Nicini* is truly relevant. The other four are *Miller v. City of Philadelphia*, 174 F.3d 368 (3d Cir. 1999), *Mammaro v. NJDCPP*, 814 F.3d 164 (3d Cir. 2016), *Navolio v. Lawrence County*, 406 F. App'x 619 (3d Cir. 2011), and *Harris ex rel. Litz v. Lehigh County Office of Children & Youth Servs.*, 418 F. Supp. 2d 643 (E.D. Pa. 2005) *Miller* and *Mammaro* are distinguishable, because they involve suits by mothers alleging that their due process rights were violated by having their children removed from their custody. 174 F.3d at 370–71; 814 F.3d at 164. Those cases bear few factual similarities to this one and do not allege the same type of constitutional deprivation that occurred here. *Navolio*, in addition to being an unpublished decision, involved a suit by an inmate in a county jail who was in pretrial detention, and who suffered injuries because he was required to walk up and down stairs while going through drug and alcohol withdrawal. 406 F. App'x at 622–23. It is factually too far afield to place social workers on notice that they must remove children from foster homes. In *Harris*, the court considered the plaintiff's allegations against Lehigh County that it had inadequate policies; it did not concern an allegation that any particular individual working for the county failed to respond to known, substantial risks. 218 F. Supp. 2d at 648.

There are some distinguishing features of *Nicini,* however, which point in different directions. First, of course, *Nicini* found against the plaintiff, denying liability. *See Pauly*, 137 S. Ct. at 552 (plaintiff must "identify a case where an officer acting under similar circumstances as [the defendant officer] *was held to have violated*" the constitutional provision at issue) (emphasis added). Second, *Nicini* involved a fifteen-year-old foster child, not a sixteen-month old. That Court relied substantially on Nicini's age, opining that he was old enough to have informed DYFS, his attorney, and the New Jersey judge about his abuse at Morra's hands. 212 F.3d at 813. Third, in *Nicini* the child was placed in a para-foster family (not a foster family), after Nicini refused to live anywhere else and had repeatedly run away from the foster families with which he had been placed by DYFS. *Id.* Thus, while *Nicini* pronounced the principle that the state can be held liable where it is deliberately indifferent to conditions in a foster placement that pose a threat to a foster child, it is not on all fours factually.

Furthermore, parts of *Nicini*'s analysis left ambiguous precisely what test I should apply in finding deliberate indifference. *Nicini* declined to rule definitively as to whether courts should find deliberate indifference upon determining that a defendant "should have known" of a risk, or whether it would require proof that the risk was "actually known" to the defendant. *Nicini*, 212 F.3d at 811. It also was unclear whether a "professional judgment" test could be appropriate as an alternative, albeit a similar one, to the deliberate indifference test. *Id.* at 811 n.9. Finally, the court did not resolve whether "failure to perform a specific duty can ever amount to deliberate indifference." *Id.* at 812. I ultimately do not regard any of these ambiguities as fatal, however. Plaintiff has established material disputes of fact which, if resolved in her favor, would prevail even under *Nicini*'s more burdensome "actually known" standard, much less the "should have known" standard. *Nicini* was clear that, to the extent any "professional judgment" standard might apply, it would be as an equivalent, not a replacement for the deliberate indifference standard. *Id.* at 811 & n.9 ("professional judgment test . . . is essentially same as deliberate

indifference test" and "[defendant's] actions in investigating the Morra home should be judged under the deliberate indifference standard"). Finally, this case does not pose the question of whether a violation of a specific duty can ever amount to deliberate indifference, so it is not crucial that *Nicini* left that question open.

If *Nicini* were the only basis for "clearly establishing" the right in this case, I would find this a very close call. My conclusion is bolstered, however, by a "robust consensus" of persuasive authority, including many cases with facts nearly identical to those in this case. All indicate that Ms. Cordero's failure to withdraw Alison from Ms. Lazala-Krohn's custody, or at least initiate further investigation, violated Alison's clearly established rights.[11]

It appears that the first Court of Appeals to identify a right similar to that invoked here was the Second Circuit in 1981. In *Doe v. New York City Dep't of Soc. Servs.*, 649 F.2d 134 (2d Cir. 1981), the Second Circuit reversed a directed verdict against a plaintiff foster child who brought a § 1983 claim. The child had been placed in a foster home where she was regularly beaten and sexually abused by her foster parent. *Id.* at 137. The agency's expert in child abuse had informed the agency that the child was likely sexually involved with her foster father recommended that she be "immediately removed from the home through legal action if necessary." *Id.* at 139. The agency decided to investigate further, but did nothing. *Id.* The finding of abuse was deleted from the expert's report. *Id.* The Second Circuit concluded that the jury should have been instructed that liability under Section 1983 could be established if an agency or agency personnel "exhibited deliberate indifference to a known injury, a known risk, or a specific duty" in light of the facts indicating that the agency knew about the child's abuse. *Id.* at 145.

---

[11] That the parties failed to cite any of these persuasive authorities does not confine my analysis. *See James*, 957 F.3d at 170 ("We may consider all relevant cases under [the clearly established] inquiry, not just those cited by the parties.").

After *Doe*, the Sixth, Seventh, Tenth, and Eleventh Circuits all found in the late 1980s or early 1990s that foster systems could be held liable for "placing children with foster parents having a known propensity to neglect or abuse children." *K.H. v. Morgan*, 914 F.2d 846, 852, 854 (7th Cir. 1990) (Posner, J.) (where state "place[d] the child in hands they know to be dangerous or otherwise unfit . . . they expose themselves to liability in damages. This right we regard as clearly established."); *Meador v. Cabinet for Human Resources*, 902 F.2d 474, 475 (6th Cir. 1990) (deliberate indifference adequately pled where three children were abused in foster home, agency worker assigned to case knew foster parents had previously sexually abused foster children, and foster mother had reported to the agency worker that the children were at risk of abuse from the foster father); *Yvonne L., By and Through Lewis v. New Mexico Dep't of Human Services*, 959 F.2d 883 (10th Cir. 1992) (reversing summary judgment granted against children who were sexually assaulted by other children housed at same foster home); *Norfleet v. Arkansas Dep't of Human Serv.*, 989 F.2d 289, 293 (8th Cir. 1993); *Taylor v. Ledbetter*, 818 F.2d 791, 792 (11th Cir. 1987) (foster child beaten and shaken into a coma by foster mother had pled claim of deliberate indifference where foster agency knew or should have known of abuse and failed to investigate); *see also H.A.L. ex rel. Lewis v. Foltz*, 551 F.3d 1227, 1231–32 (11th Cir. 2008); *Davis v. Carroll*, 805 F. App'x 958, 962 (11th Cir. 2020); *Hernandez ex rel. Hernandez v. Texas Dep't of Protective & Regulatory Servs.*, 380 F.3d 872 (5th Cir. 2004).

More recently, but still before the events in suit here, the Ninth Circuit concluded that it was clearly established that children were entitled to safe foster care, and that when state actors knowingly disregarded a risk to foster children's safety, they could be held liable under section 1983. *Tamas v. Dep't of Soc. & Health Servs.*, 630 F.3d 833, 846–47 (9th Cir. 2010). The court noted the decisions in *Doe*, *Meador*, *K.H.*, *Yvonne, Norfleet* and *Nicini,* and concluded that it was clearly established by 1996 that foster children had "a protected liberty interest in safe foster care placement once they became wards of the

state." *Id.* Though *Tamas* "express[ed] no view as to the outcome of the individualized qualified immunity inquir[y]," it directed the district court, on remand, to specifically consider the following facts: social workers were (1) aware of allegations that the foster parent had "French kissed" the foster child, (2) that the foster child would point at her bottom and say that she had told "Papa [(the foster father)] to stop," and (3) that there had been two complaint referrals indicating the foster father was physically abusing the foster mother and sexually abusing the foster child. *Id.* at 847.

Similarly, in *Doe ex rel. Johnson v. South Carolina Dep't of Social Servs.*, the Fourth Circuit concluded that a child has a substantive due process right to protection from known dangers by state officials when placed in foster care. 597 F.3d 163, 175 (4th Cir. 2010). There, the foster system placed a child, "Jane," in foster care with her brother, who had been sexually abusing her. *Id.* at 168. A therapist had informed Jane's social worker about the sexual abuse and warned that the brother "ha[d] been a danger to [Jane]." *Id.* at 167–68. The foster system proceeded to place the two together with a foster family anyway, and Jane was abused by her brother. *Id.* at 167. The Court of Appeals found that Jane's constitutional rights were violated by being paired for placement with her brother. Having found a constitutional claim, however, the Court went on to hold that such a right was not "clearly established" by 2010 because of Fourth Circuit precedent which could have given the "quite reasonable" impression that the Circuit "would have answered the . . . question in the negative and foreclosed the existence of such a right." *Id.* at 177. Post-*Doe,* however, the Fourth Circuit must be regarded as having answered that question in the positive.

The Second and Fourth Circuit *Doe* decisions and *Meador* are particularly applicable. In all three cases, state foster care workers received information which indicated that circumstance in a foster household posed a significant threat of abuse. Each time, the agency failed to act on the threat, and the child was thereafter abused by a member of the foster household.

Thus, there is not merely a "robust consensus" of other circuit decisions; there is a long string of Court of Appeals decisions holding, for qualified immunity purposes, *that there is a robust consensus.*

Of course such a consensus would not sway the analysis if there were strong indications that our Circuit would go contrary. But the controlling *Nicini,*case, while distinguishable, strongly suggests that the Third Circuit, presented by the same issue, would not opt to be an outlier. The 2016 *S.R.* case, though post-dating the events in suit, strongly confirms that impression.

I find it is "clearly established" that foster care caseworkers can be held liable for their failure to respond to credible evidence of the risk of abuse or neglect in a foster home. As previously discussed, a jury could conclude that Ms. Cordero and Ms. Moody ignored a known and substantial risk by failing to respond appropriately to Ms. Lazala-Krohn's failure to take Alison to the hospital after Alison fell out of a chair and struck her head on a bookcase. That is not the only possible conclusion a jury could reach, but it is a permissible one. If the facts were found in that way, it could be established with sufficient clarity that the caseworkers failed in their duty to protect the child.

I therefore deny DCF's motion for summary judgment as it applies to defendants Cordero and Moody.

### 4. *Respondeat Superior* Liability under Section 1983 and the NJCRA

A question remains as to supervisory liability—specifically whether Alison Blake, the former commissioner of DCPP, or Ms. Egwu-Onyema, Mr. Henningsen's supervisor, can be held liable for the acts of subordinates.

In general, "[g]overnment officials may not be held liable [under Section 1983] for the unconstitutional conduct of their subordinates under a theory of *respondeat superior.*" *Barkes v. First Correctional Medical, Inc.*, 766 F.3d 307, 316 (3d Cir. 2014) (quoting *Bistrian v. Levi*, 696 F.3d 352, 366 (3d Cir. 2012), *rev'd on other grounds, Taylor v. Barkes*, 575 U.S. 822, 824 (2015) ("The majority first determined that respondents had alleged a cognizable theory of

supervisory liability (a decision upon which we express no view)"). The Third Circuit has, however, identified

> two general ways in which a supervisor-defendant may be liable for unconstitutional acts undertaken by subordinates. First, liability may attach if they, "with deliberate indifference to the consequences, established and maintained a policy, practice or customer which directly caused [the] constitutional harm." Second, "a supervisor may be personally liable under § 1983 if he or she participated in violating the plaintiff's rights, directed others to violate them, or, as the person in charge, had knowledge of and acquiesced" in the subordinate's unconstitutional conduct.

*Id.* (cleaned up). *Barkes* was clear, however, that so-called "failure to" claims, such as "failure to train, failure to discipline, or . . . failure to supervise—are generally considered a subcategory of policy or practice liability." *Id.*

Plaintiff points to no evidence to support the conclusion that Alison was injured as a result of a DCF or DCPP policy, much less a policy established with deliberate indifference to negative consequences. As a result, I grant summary judgment in favor of defendant Alison Blake, who is not alleged to have played any personal role in any of the facts of this case.

Nor can I find a basis for supervisory liability with respect to Brigid Egwu-Onyema, Mr. Henningsen's supervisor. Since I find no predicate underlying liability stemming from the personal involvement of Mr. Henningsen, I must grant summary judgment in favor of Ms. Egwu-Onyema on the supervisory liability claim.

### B. Common Law Claims and the NJTCA: DCF Defendants

The New Jersey Tort Claims Act ("NJTCA") was adopted to protect the State of New Jersey from civil tort liability and afford broad immunities to state entities and employees. Under the NJTCA, "immunity from tort liability is the general rule and liability is the exception." *D.D. v. Univ. of Med. & Dentistry of N.J.*, 213 N.J. 130, 134 (N.J. 2013); *see also Coyne v. State Dep't of Transp.*, 182 N.J. 181 481, 488 (N.J. 2005). The Act interacts with the doctrine of sovereign immunity, which provides that states are not subject to suit unless they have provided express legislative consent. *Berg v. Christie*, 225 N.J. 245,

287 (N.J. 2016). The NJTCA provides such express consent, but only in limited circumstances. N.J. Stat. Ann. § 59:1-2.

DCF defendants claim immunity under a variety of NJTCA provisions, including the immunities for failing to enforce the law or making discretionary decisions, as well as good faith qualified immunity.

### 1. Absolute Immunity from claims of "failure to enforce the law"

The Tort Claims Act "grants an unqualified or absolute immunity to both public entities and their employees from liability for injuries caused by a failure to enforce the law." *Bombace v. Newark*, 125 N.J. 361, 366 (N.J. 1991); *see also* N.J. Stat. Ann. § 59:3-5, 59:2-4. That provision must be read in conjunction with N.J. Stat. Ann. § 59:3-3, which "provides public employees with only qualified immunity with respect to the enforcement of the law." *Id.* (quoting N.J. Stat. Ann. § 59:3-3). The "Act thus furnishes public entities and employees unqualified immunity for the 'failure to enforce any law' [and] provides such employees with a qualified immunity, one that applies to 'acts' done in the 'execution or enforcement of any law,' provided those 'acts' are performed in good faith." *Id.* at 367.

### a. Breach-of-duty vs. failure-to-enforce claims

The threshold question, then, is one of categorization: whether plaintiffs' claims are for "failure to enforce any law," or else for misconduct "in the execution or enforcement of any law." *Id.* at 366. As the New Jersey Supreme Court has acknowledged,

> [t]he meaning encompassed by 'failure to enforce a law' under N.J. Stat. Ann. § 59:3-5 is not self-explanatory. The language itself reasonably suggests that the essential conduct constituting failure to enforce a law would consist of a failure to act, an omission, or non-action . . . . Thus, considerations of language and structure impel the inference that the absolute immunity of section 3-5 applies to non-action or the failure to act in connection with the enforcement of the law, and the qualified immunity of section 3-3 applies to acts constituting enforcement of the law.

*Id.* at 367–68. Thus, when the claim is based on nonfeasance, such an omission or inaction, absolute immunity applies; when a claim is based on malfeasance, such as negligent execution of the laws, only qualified immunity applies.

The distinction between acts and omissions has proven elusive, and what constitutes inaction as opposed to action is often a semantic rather than a factual matter. *Archie v. Racine*, 847 F.2d 1211, 1213 (7th Cir. 1988) (Easterbrook, J.) ("it is possible to restate most actions as corresponding inactions with the same effect"); *cf. Nat'l Fed.'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 612–13 (2012) (Ginsburg, J., dissenting). The New Jersey Supreme Court has offered some clarification, however, rejecting the theory that "[w]hen a sequence of events is involved, one enforcement event which constitutes an 'act' will stamp the entire sequence as an 'act' regardless of other events which involve failures to act." *Bombace*, 125 N.J. at 369 (quoting *Marley v. Borough of Palmyra*, 193 N.J. Super. 271, 292 (Law. Div. 1983)). Instead, the Court set forth the following test: "application of the absolute immunity under the Act is determined by whether the critical causative conduct by government employees consists of non-action or the failure to act with respect to the enforcement of the law." *Id.* at 373.

*Bombace* itself is instructive. There, a city inspector inspected a property and identified a smoke-detector violation. The inspector issued a violation notice to the building manager and sent a report to the Fire Inspection Bureau, but then failed to follow through on an enforcement action against the building. *Id.* at 371. The court reasoned that the plaintiff's claim was not that the inspector had negligently performed the inspection; it was that the inspector had omitted to follow up by instituting an enforcement action. *Id.* The inspection and issuance of a violation notice, though surely acts in the chain of causation, "were not relied on as a basis for liability," and so they did not alter the fundamental character of the claim, which was one of failure to enforce. *Id.*; *see also Lee v. Brown*, 232 N.J. 114, 129 (N.J. 2018) ("The critical causative

conduct in this case was Bierals' failure to contact Del Carmen and secure an emergency power shut-off or to seek relief in court, not any affirmative action . . . . The fire is alleged to have been caused by the faulty wiring on the electrical panels. It was not the result of any corrective action taken by Bierals."). In short, the *Bombace* court viewed this as a nonfeasance case, to which the failure-to-enforce immunity applied.

In *Maison v. New Jersey Transit Corp.*, however, the New Jersey Supreme Court complicated this analysis. There, a bus driver allegedly failed to eject unruly teenagers from a bus. 245 N.J. 270, 303–04 (N.J. 2021). The teens had been throwing projectiles, engaging in violent behavior, and annoying or alarming other people, all actions which are explicitly banned by bus regulations. *Id.* at 302. The bus driver argued that the allegations therefore constituted a claim of nonfeasance, *i.e.,* failure to enforce those bus regulations. The Court rejected the bus drivers' argument, noting that the regulations did not grant bus drivers enforcement authority. *Id.* at 303. It reasoned that bus drivers' duties "do not mirror a police officer's powers to make an arrest or a code enforcement official's authority to enforce a municipal building code violation in municipal court," noting that "[a] bus driver is not a public official charged with enforcing specific criminal, fire, or building codes." *Id.*

The Court found that the duty involved in *Maison* was not an enforcement-based duty, but rather the bus driver's duty of care as a common carrier to "exercise the 'utmost caution' in transporting his passengers safely." *Id.* at 303. That duty, the court reasoned, "might have included him telling the unruly teenagers to stop harassing Maison or to get off the bus . . . ." *Id.* The "critical causative conduct" giving rise to the plaintiff's injuries, then, was the driver's breach of common-carrier duties of care, not the driver's failure to discharge a duty to enforce regulations. *Id.* at 303–04. The state's regulations "could not extinguish centuries-old common-carrier duties" because to "hold otherwise would effectively allow public entities to immunize themselves from

tort liability by enacting ordinances or promulgating regulations and pleading enforcement as a defense." *Id.* at 304.

The *Maison* court relied on *L.E. v. Plainfield Public Sch. Dist.*, 456 N.J. Super. 336, 346 (App. Div. 2018), where a school district asserted the failure-to-enforce immunity against a claim based on the sexual assault of a student on school grounds. *Maison* agreed with *L.E.* that "the plaintiffs' claims were not based on 'the non-enforcement of laws, but on the negligent discharge of the supervisory function that the school had already assumed when students were attending class.'" 245 N.J. at 304 (quoting *L.E.*, 456 N.J. Super. at 346).

Two lessons can be drawn from *Maison*. First, the mere existence of regulations which govern conduct do not convert an omission into a failure-to-enforce; to be liable for failure to enforce, the defendant public official must possess an enforcement function. *Id.* at 303–04. Second, if the official is subject to a well-established duty of care, like that of a common carrier, the additional existence of regulations will not vitiate a claim based on that duty of care. *Id.* at 304. Those two principles help differentiate the case of the bus driver from that of the code enforcement officer. In *Maison* and *L.E.*, the public employee had a well-established duty to exercise care, whether as a common carrier or as a school entrusted with the welfare of minors. Thus there was a viable claim in *Maison* and *L.E.* for breach of that duty of care, independent of any failure to enforce the law. In *Bombace* and *Lee*, however, the injury flowed directly from those defendants' failure to follow up on findings of faulty electrical or fire safety systems. The very gist of those claims, then, was nonfeasance: *i.e.,* that those defendants had had not done their job, which was to enforce the housing or fire code. Hence, the failure-to-enforce immunity applied.

### b. Application to this foster-care claim

One important question in this case, then, is whether the defendant foster-care authorities possessed a duty of care which existed independent of any obligation to enforce the law.

There are New Jersey decisions which tend to suggest that state foster agencies owe no duty of care to foster children to protect them against the negligence of foster parents. *See Stanley by Stanley v. Slate Industries, Inc.*, 267 N.J. Super. 167, 171–72 (Law Div. 1993); *see also Dieujuste v. DYFS*, 2017 N.J. Super. Unpub. LEXIS 1946 at *4–6 (App. Div. Aug. 1, 2017) ("Clearly, DYFS must perform its duties responsibly but there is no authority or legal standard in New Jersey that requires it to be a guarantor that no harm will befall children it has placed in resource homes," so DYFS is not "liable for the negligence of foster parents"); *New Jersey Property Liab. Ins. Guar. v. State*, 195 N.J. Super. 4, 16 (App. Div. 1984) ("To adopt such a theory would place an intolerable burden upon the State and might well diminish the beneficial effects of the foster parent program and compel a return to institutional care").

*Stanley* itself, however, distinguished such a derivative claim from one based directly on the negligence of the foster-care authorities themselves: While "courts appear reluctant to hold agencies liable where the child's injuries result from the foster parent's ordinary negligence," they will nevertheless hold them liable "where the agency has negligently placed or supervised a child with assaultive or abusive foster parents." *Id.* at 170. In so stating, *Stanley* was surveying decisions from other jurisdictions; it did not explicitly recognize such a cause of action under New Jersey common law. Nevertheless, I believe New Jersey's Supreme Court would recognize it. *See Mills v. Ethicon, Inc.*, 406 F. Supp. 3d 363, 376 (D.N.J. 2019) ("In the absence of a controlling decision by the [state supreme court], we must predict how it would decide the questions of law presented in this case.") (quoting *Wolfe v. Allstate Prop., & Cas. Ins. Co.*, 790 F.3d 487, 492 (3d Cir. 2015)).

In parallel with federal constitutional standards, *see* Section IV.A.2.i, *supra*, New Jersey recognizes in many contexts that where a child is "compelled by law" to enter the state's custody, such as where a child "must attend school and is subject to school rules and discipline," state officials are "obligated to take reasonable precautions for [the child's] safety and wellbeing." *L.E.*, 456

N.J. Super. at 347 (quoting *Frugis v. Bracigliano*, 177 N.J. 250, 270 (N.J. 2003)). At least in the school context, such an obligation "extends to 'foreseeable dangers . . . [that] arise from the careless acts or intentional transgressions of others.'" *Id.* The duty arises because the state requires attendance and therefore assumes responsibility.

The parallels between the school and foster care contexts are apparent, though the two are far from identical. In school, the state's employees directly supervise children and are charged with their constant oversight and care. In foster care, the supervision exercised by the state's employees is necessarily more general and sporadic, as the primary caretakers are the foster parents. It stands to reason, then, that the standard of care for schools and teachers would be more exacting than the one applicable to foster-care agencies.

State foster agencies exercise a measure of control that is not comprehensive, but is significant. It makes sense that they should be answerable, not comprehensively, but for the manner in which they exercise that measure of control. Foster agencies choose and monitor foster parents, for instance; where the state, in the course of exercising those functions, becomes aware of facts indicating that a foster parent is abusing a child, the state should be required to act. In other words, it appears likely to me that the New Jersey Supreme Court would recognize a common law obligation to exercise reasonable care in identifying abusive or severely neglectful foster parents and protecting children from those parents.

Having so concluded, I find that this case falls on the *Maison* side of the *Maison/Bombace* line. Plaintiff claims that the DCF defendants negligently failed to discharge their duty to protect Alison from a neglectful or abusive foster parent, not that they failed to enforce DCF or DCPP regulations. Ms. Lazala-Krohn, it is alleged, observed a blow to the child's head and suspected a concussion, but opted not to take her to the doctor even after a case worker directly instructed her to do so. Depending on the facts as they develop, a fact

finder could conclude that the state's inaction in the face of Lazala-Krohn's conduct was culpable.[12]

The DCF or DCPP defendants are not merely public employees charged with enforcement of regulations. By taking charge of the child and placing her with a foster family, they took on a duty of care to protect her from abuse or neglect, within the scope of their supervisory functions. Plaintiff's claim is that these defendants' failure to conform their conduct to that duty was the "critical causative conduct" which resulted in Alison's injury. This claim is therefore properly viewed as one of active negligence in the execution of these defendants' legal duties, not an omission in the form of failure-to-enforce. The failure-to-enforce immunity does not apply.

### 2. Qualified "Good Faith" Immunity

I find that all of the DCF employees other than Ms. Cordero and Ms. Moody are entitled to the NJTCA's qualified immunity for officials who act in "good faith in the execution or enforcement of any law." N.J. Stat. Ann. § 59:3-3.

The NJTCA's "good faith" provision immunizes employees who have acted (a) with objective reasonableness, or (b) with subjective good faith. *Toto v. Ensuar*, 196 N.J. 134, 146 (N.J. 2008). That is a disjunctive analysis: an employee may be found immune under either prong. *Leang v. Jersey City Bd. of Educ.*, 198 N.J. 557, 582–83 (N.J. 2009); *Alston v. City of Camden*, 168 N.J. 170, 186 (N.J. 2001).

Under the objective reasonableness test, courts "appl[y] the same standards of objective reasonableness that are used in federal civil rights cases" to analyze qualified immunity. *N.E. v. J.V. v. DYFS*, 449 N.J. Super. 379, 404 (App. Div. 2017); *see also Wildoner v. Borough of Ramsey*, 162 N.J. 375,

---

[12] Indeed, allegations of this kind, if borne out and sufficiently extreme, might furnish a basis to remove a child from her biological parents, to say nothing of foster parents. *See, e.g. NJDCPP v. D.O.M.*, 2020 N.J. Super. Unpub. LEXIS 2410 at *3–4 (App. Div. Dec. 16, 2020) (termination of father's parental rights appropriate where father was aware of child's "deterioration" and had "fail[ed] to get her 'the medical care that she need[d].'").

387 (N.J. 2000). As explained in Section IV.A, *supra,* qualified immunity applies to protect all of the DCF defendants except Ms. Cordero and Ms. Moody. The same analysis applies here.[13]

I therefore consider whether Ms. Cordero and Ms. Moody would be entitled to qualified immunity under the alternative, "subjective" reasonableness test. The subjective test shields even wrongful conduct, provided that the employee's mental state falls short of that required for "crime, actual fraud, actual malice, or willful misconduct." *B.F. v. DYFS*, 296 N.J. Super. 372, 385 (App. Div. 1997). Thus, "ordinary negligence is an insufficient basis for holding liable a public employee involved in the execution of the law under N.J. Stat. Ann. § 59:3-3." *N.E.*, 449 N.J. Super. at 407 (quoting *B.F.*, 296 N.J. Super. at 386).

Plaintiffs provide no facts indicating that Ms. Cordero or Ms. Moody, or any other DCF defendant for that matter, committed a crime or actual fraud, or acted with actual malice. As to willful misconduct, however, there is enough evidence to present a jury question.

"Willful misconduct" is difficult to pin down as a matter of law. "Like many legal characterizations, willful misconduct is not immutably defined but takes its meaning from the context and purpose of its use. While its general contours, given its language, are similar in all contexts, it may differ depending on the common-law rule or the statute to which it is relevant, and perhaps even within such rule or statute differing depending on the facts." *Fielder v. Stonack*, 141 N.J. 101, 124 (N.J. 1995). Thus, "there is no simple formula which will describe with exactness the difference between negligence and willful and wanton misconduct. The concept of misconduct ranges in a number of gradations from slight inadvertence to malicious purpose to inflict injury." *Id.*

---

[13]     Above, I rejected plaintiff's civil rights claims against the agencies, DCPP and DCF, because they are not "persons" under the civil rights statutes. That basis for dismissal does not apply here. Still, the analysis of objective reasonableness is parallel, and the agencies, too, are entitled to good faith immunity from claims based on the actions of their employees.

at 123–24 (quoting *McLaughlin v. Rova Farms, Inc.*, 56 N.J. 288, 305 (N.J. 1970)). *Fielder*, in the context of a police pursuit, defined willful misconduct as "the commission of a forbidden act with actual (not imputed) knowledge that the act is forbidden. It is more than an absence of 'good faith.'" *Id.* at 124 (quoting *Marley v. Borough of Palmyra*, 193 N.J. Super. 271, 294–95 (Law Div. 1983)). Thus, in *Fielder*, willful misconduct required "a knowing violation of a specific command, or a standing order, that would subject that officer to discipline." *Id.* at 125.

*Fielder* noted that willful misconduct had been defined in prior decisions as "reckless disregard for safety." *Id.* at 124 (quoting *McLaughlin*, 56 N.J. at 305). Thus, it required that a defendant, with "knowledge of existing conditions, and conscious from such knowledge that injury will likely or probably result from his conduct, and with reckless indifference to the consequences, consciously and intentionally does some wrongful act or omits to discharge some duty which produces the injurious result." *Id.* Subsequent decisions, in a variety of contexts, appear to have equated willful misconduct with recklessness. *See Canico v. Hurtado*, 144 N.J. 361, 365 (N.J. 1996) ("recklessness usually denies good faith") (citing *Marley*, 193 N.J. Super. at 294) (police responding to accident struck civilian car); *Dunlea v. Twp. of Belleville*, 349 N.J. Super. 506, 512 (App. Div. 2002); *see also Bezerra v. DeLorenzo*, 2012 WL 3166598 at *12 (App. Div. Aug. 7, 2012) (zoning officer allegedly wrongfully interfered with construction of two-family home); *Dayton v. Simpson*, 2010 WL 1526285 at *5 (App. Div. Apr. 19, 2010); *Capps v. Dixon*, 2021 WL 2024998 at *8 (D.N.J. May 21, 2021) (claim that supervisors failed to prevent excessive force by police officers); *Drisco v. City of Elizabeth*, 2010 WL 1253890 at *9 n.20 (D.N.J. Mar. 23, 2010) (malicious prosecution); *Klemash v Monroe Twp.*, 2010 WL 455263 at *12 (D.N.J. Feb. 4, 2010).

I find that plaintiff's evidence raises a material dispute of fact which, if resolved in her favor, could establish recklessness. As previously discussed, there is at least a material dispute of fact as to whether defendants were

deliberately indifferent to risks to Alison's life and health. *See* Section IV.A.2–3, *supra.* A jury could find that Ms. Cordero and Ms. Moody knew facts which indicated that Alison faced a substantial risk of serious harm, inferred that such harm could befall Alison, and nevertheless did not remove her from the custody of Ms. Lazala-Krohn. *Nicini*, 212 F.3d at 811. That is essentially the same as a claim of recklessness, which requires proof of conscious disregard of an unjustifiable risk. *Fielder*, 141 N.J. at 124. Thus, my conclusion as to the deliberate indifference claim applies here as well: A reasonable jury would not have to, but could, conclude that Ms. Cordero and Ms. Moody were reckless and thus lacked subjective good faith.

DCF and DCPP claim that they cannot be held liable for an employee's acts which constitute "willful misconduct," such as the allegedly reckless acts of Ms. Moody and Ms. Cordero. (DE 186 at 15 n.8.)[14] I agree. There are two possibilities here: One, a jury could conclude that Moody and Cordero did not commit willful misconduct and thus are not liable, in which case there would be no underlying liability to attribute to DCF and DCPP. N.J. Stat. Ann. § 59:2-2b. Two, a jury could conclude that Moody and Cordero did commit willful misconduct, in which case DCF and DCPP could not be held liable because "[a] public entity is not liable for the acts or omissions of a public employee constituting . . . willful misconduct." N.J. Stat. Ann. § 59:2-10. Either way, DCF and DCPP cannot be held liable for these individual defendants' conduct, and the claims against the agencies must be dismissed on summary judgment.

### 3. NJTCA discretionary-decisions immunity

Defendants assert that Ms. Moody and Ms. Cordero are absolutely immune because they were engaged in discretionary decision making within the meaning of the New Jersey Tort Claims Act ("NJTCA"), N.J. Stat. Ann. §

---

[14]     DCF and DCPP also could not be held liable for the actions of the other DCF defendants because, as explained above, those defendants are immune under the objective good faith prong. A "public entity is not liable for an injury resulting from an act or omission of a public employee where the public employee is not liable." N.J. Stat. Ann. § 59:2-2b.

59:2-3(a) (entities are immune for liability "resulting from the exercise of judgment or discretion vested" in them); N.J. Stat. Ann. § 59:3-2(a) (same for employees). I agree.

The parties, and to some extent the New Jersey courts, disagree over the scope of "discretionary" conduct that will invoke the immunity.

N.J. Stat. Ann. § 59:3-2 provides:

a. A public employee is not liable for an injury resulting from the exercise of judgment or discretion vested in him;

b. A public employee is not liable for legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature;

c. A public employee is not liable for the exercise of discretion in determining whether to seek or whether to provide the resources necessary for the purchase of equipment, the construction or maintenance of facilities, the hiring of personnel and, in general, the provision of adequate governmental services;

d. A public employee is not liable for the exercise of discretion when, in the face of competing demands, he determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel unless a court concludes that the determination of the public employee was palpably unreasonable.

Nothing in this section shall exonerate a public employee for negligence arising out of his acts or omissions in carrying out his ministerial functions.

N.J. Stat. Ann. § 59:3-2. N.J. Stat. Ann. § 59:2-3, in nearly identical language, sets out the same immunities for public entities.

Plaintiff relies on *Costa v. Josey*, a New Jersey Supreme Court decision from 1980 which concluded that the discretionary immunity set out in subsection (a) applies only to high-level decision making. 415 A.2d 337, 340 (N.J. 1980). That court reasoned that a

literal interpretation of the term "discretion" would effectively exempt from the operation of the Tort Claims Act all government action unless it resulted from mere inadvertence. Almost all official

49

conduct, no matter how ministerial, involves the exercise of some
judgment and decisionmaking. To construe subsection (a) that
broadly, however, would in effect eliminate most of the liability
which the Legislature clearly intended to permit when it enacted
the statute.

*Id.* at 343. The Court thus concluded that the government's decision whether
to maintain a barrier separating eastbound and westbound traffic on a highway
was a high-level policy decision, entitled to the discretionary-decisions
immunity. On the other hand, however, the government's operational decisions
regarding highway maintenance did not operate at the policymaking level, were
not discretionary, and hence were not immunized. *Id.* at 340 ("Once it is
determined that a maintenance program involving resurfacing will be
undertaken . . . the government will ordinarily be held to the standard of care
set forth in N.J. Stat. Ann. § 59:4-2.").

   The New Jersey Supreme Court has reaffirmed the *Costa* analysis several
times. In *Tice v. Kramer*, 627 A.2d 1090 (N.J. 1993), it relied on *Costa* to
reiterate that discretionary immunity applies only to "discretion exercised at
the highest levels of government in matters of policy or planning." *Id.* at 1100.
*Tice* held that a police officer's conduct, which "comprised . . . the decision
whether to pursue, how to pursue, and whether to continue to pursue, is also
infinitely distant from high-level policy or planning decisions . . . . [T]o label
this kind of determination by a public employee 'discretionary,' and therefore
immune, would end all public employee liability, or practically all, for hardly
any acts or omissions are not subject to some judgment or discretion." *Id.* at
1101. The New Jersey Supreme Court revisited the issue in *Coyne v. DOT*, 182
N.J. 481, 489–90 (N.J. 2005), concluding once again that the discretionary
decisions which are immune under the act are "actual, high-level policymaking
decisions involving the balancing of competing considerations" and agreeing
with *Costa* that the immunity "should be read in conjunction with the areas of
protected discretion expressly outlined in subparagraphs (b), (c) and (d)." *Id.*
(quoting *Costa*, 83 N.J. at 54–55); *see also Kolitch v. Lindedahl*, 100 N.J. 485,

495–96 (N.J. 1985) ("there is a distinction to be made between a planning-level or discretionary decision, which is generally entitled to immunity, and an operational or ministerial action, which is not. As one court has explained, 'a discretionary act . . . calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and *acting on them* in a way not specifically directed.") (emphasis in original).

The DCF defendants, however, cite a line of cases which appear to impose a different test. In *Lee v. Brown*, the New Jersey Supreme Court considered an electrical inspector's determination that an electrical panel was not up to code and was "extremely dangerous." 232 N.J. 114, 120 (N.J. 2018). The inspector issued a notice of violation and order to terminate electrical service, but never followed through on departmental policy to notify his direct supervisor or issue an order to shut off electrical service to the home. *Id.* at 120–21. The panel caught fire, resulting in the deaths of four people.

The State Supreme Court stated that the electrical inspector's failure to follow up on the code violation, though governed by departmental policy, was nevertheless a discretionary action, rather than a ministerial one.[15] The inspector "had a broad range of discretion in investigating and resolving code violations—for example, he could issue a notice to repair the issue, a summary offense, or seek a shut-off through departmental procedure, among other options." *Id.* at 124 n.1. It noted that the inspector "was not required to follow a prescribed course of action by law," so "his actions were not subject to liability under an ordinary negligence standard." *Id.* Thus *Lee* tended to emphasize the *breadth* of discretion, rather than considering whether the inspector's acts rose to the status of high-level decision making.

---

[15] As the Court acknowledged, however, the issue of discretionary immunity was not included in the order on appeal and had not been addressed by the Appellate Division. *Id.*

Similarly, in *S.P. v. Newark Police Dep't*, 428 N.J. Super. 210, 230 (App. Div. 2012), the Appellate Division defined a "discretionary act" as one that "calls for the exercise of personal deliberations and judgment, which in turn entails examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed," while "a ministerial act is 'one which a person performs in a given state of facts in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act being done." *Id.* at 230–31 (cleaned up). The claim in that case rested on the failure of the police to arrest the plaintiff's alleged attacker pursuant to the Prevention of Domestic Violence Act. The Appellate Division found inapplicable the New Jersey Supreme Court's decision in *Tice*, noting that officers had to make a number of discretionary decisions, such as determining whether an individual is a victim of domestic violence and deciding whether to press charges. *Id.* at 231–32. The NJTCA discretionary-acts immunity therefore applied.

These two lines of authority appear to take disparate approaches to the application of the discretionary immunity. The cases do not always account for or explain the distinction. Although it may not affect the result here—I find the immunity would apply under either approach—I find that there is a basis for reconciliation of these lines of authority.

These two lines of cases may be interpreted in a manner that permits them to coexist. For the most part, for example, they rest on the "acts vs. omissions" distinction; often, they do not address the overlaid issue of how "discretion" might be defined differently in relation to the various statutory subsections. By doing so, however, it is possible to discern that *Lee* and *S.P.* can be distinguished legally from *Tice* and *Josey*. In particular, the "high-level" policy requirement may be seen as applying to the general provision, subsection (a), but not to the specific provisions of (b), (c), and (d).

The "high-level decision making" analysis set forth in *Costa*, *Coyne*, *Tice* and *Kolitch,* arose under the blanket immunity-creating language of subsection

(a) of N.J. Stat. Ann. § 59:3-2, not the specific provisions of subsections (b), (c), and (d). That is a distinction with a difference, as the New Jersey Supreme Court explained in *Brown v. Brown*:

> Subsections b, c and d relate to specific circumstances. Under subsection b, immunity is given for legislative, administrative, or judicial action or inaction. Subsection c is concerned, as noted above, with the exercise of discretion in determining whether to provide the resources necessary for certain purposes. Subsection d involves the exercise of discretion when in the face of competing demands, the governmental body determines whether and how to utilize existing resources.
>
> In sharp contrast, subsection a is set forth in general terms, immunizing a public entity for injury resulting from the exercise of judgment or discretion. We recently . . . concluded that the exemption under subsection a concerns the 'exercise of judgment or discretion' in making basic policy — the type made at the planning, rather than the operational, level of decisionmaking.

86 N.J. 565, 577 (N.J. 1981).

As the Appellate Division would subsequently explain, "*Brown* makes clear that a discretionary decision of a public entity under subsection (d) of N.J. Stat. Ann. § 59:2-3 and, necessarily, one made by a public employee under subsection d of N.J. Stat. Ann. § 59:3-2 need not be one made at the high level required under subsection a." *Longo v. Santoro*, 195 N.J. Super. 507, 518 (App. Div. 1984); *see also Daniel v. State Dep't of Transp.*, 239 N.J. Super. 563, 598 (App. Div. 1990) ("subsection c and d do not require 'high-level planning decisions' as the predicate for immunity as does subsection a").

This district court has extended that reasoning to subsection (b) in particular. *See also Bilbili v. Klein*, 2005 WL 1397016 at *11 (D.N.J. June 14, 2005) ("[s]ubsection (b) of N.J. Stat. Ann. § 59:2-3 'deals with the operational level of decisionmaking and does not implicate high level policymaking decisions."). Thus, "the sorts of discretionary acts which are covered by subsection (b) are those which 'call[] for the exercise of personal deliberations and judgment, which in turn entail[] examining facts, reaching reasoned conclusions, and acting on them in a way not specifically directed." *Galliano v.*

*Borough of Seaside Heights*, 2007 U.S. Dist. LEXIS 23622 at *93 (D.N.J. Mar. 30, 2007) (quoting *Bilbili*, 2005 WL 1397016 at *11). The *specific* application of subsection (b), then, does not necessarily depend on whether the state actor was a high-level employee.

*Lee* only discussed the discretionary immunity in passing, and did not clarify which subsection would apply to the code inspector's conduct.[16] The case may be analyzed, however, as implicating subsection (b), rather than subsection (a). It concerned the failure of a code inspector to either issue an emergency shutoff of electricity or to initiate a court enforcement proceeding. *See Lee*, 232 N.J. at 239 ("The critical causative conduct in this case was Bierals' failure to contact Del Carmen and secure an emergency power shut-off or to seek relief in court"). That conduct fits within N.J. Stat. Ann. § 59:3-2(b) (immunizing "legislative or judicial action or inaction, or administrative action or inaction of a legislative or judicial nature").[17]

Subsection (b) applies where the defendant has engaged in "judicial action or inaction," or "administrative action or inaction [of a] judicial nature."

---

[16]     *Lee* mentioned the discretionary immunity only in a footnote, while noting that the Appellate Division had not addressed the issue:

> The standard for liability under the TCA depends on whether the conduct of individuals acting on behalf of the public entity was ministerial or discretionary. *Henebema v. S. Jersey Transp. Auth.*, 219 N.J. 481, 490 (N.J. 2014) (citing N.J. Stat. Ann. § 59:2-3(d)).

*Lee,* 232 N.J. at 124 n.1. Subsection (d), however, only applies to decisions "when, in the face of competing demands, [the entity or employee] determines whether and how to utilize or apply existing resources, including those allocated for equipment, facilities and personnel," and so would not necessarily appear to apply to the facts of *Lee.*

[17]     *S.P.* is more problematic. It could be distinguished from *Josey* and *Tice* on the ground that it concerned a claim based on the police's failure to arrest an individual, which is covered by a separate provision, N.J. Stat. Ann. § 59:5-5 ("Neither a public entity nor a public employee is liable for injury caused by the failure to make an arrest or by the failure to retain an arrested person in custody."). Any such argument is must face the reality that *S.P.* explicitly cited the discretionary immunity provision. *Id.* at 230–32. The explanation may be that *S.P.,* an Appellate Division case, rested on the "acts vs. omissions" analysis, and simply did not focus on the distinctions between subsections outlined in *Brown v. Brown.* The *S.P.* decision might also be limited to the context of a police officer's determination that an individual was

New Jersey courts have not provided much in the way of a definition of those terms. In *Denis v. City of Newark*, 307 N.J. Super. 304, 316–17 (App. Div. 1998) the court declined to conclude that a decision not to suspend a police officer accused of misconduct, while "discretionary," was not necessarily of a "judicial" nature on a sparse record where it was unclear "whether disciplinary hearings were held . . . whether the hearings were part of an informal administrative process, or whether they were formal proceedings presided over by the chief of police," and where the court "d[id] not know what evidence, if any, was presented at such hearings." *Id.* In *Bilbili v. Klein,* however, the district court concluded that the decision whether to immediately suspend a state employee prior to a hearing did constitute an administrative action of a judicial or legislative nature. 2005 WL 1397016 at *11. *Bilbili* noted that such a summary suspension could be made immediately, prior to any formal procedures, and that it called for the state employer's exercise of personal deliberation and judgment.

Assume *arguendo*, then, that *Lee's* finding of immunity rested on subsection (b). If so, a shutoff order or institution of a court proceeding would occupy the status of an "administrative action" of a "judicial nature" (which the inspector failed to pursue). And if that is so, then DCPP's acts and omissions here should implicate "administrative action" of a "judicial nature" as well. The allegation against the DCF defendants is that they should have removed Alison from the foster home, or at least instituted a further investigation of abuse. Those would certainly be "administrative actions"; the DCF is expressly empowered to remove a child from a foster home if it finds the child is at risk, in advance of any further inquiry or an application to a judge. N.J.A.C. 3A:17-2.1–2 (authorizing removal of child from foster home upon determining, in an emergency situation, that there is a risk to safety, or, in a non-emergency situation, essentially whenever such a removal is preferable); *see also W.C. v. P.M.*, 155 N.J. Super. 555, 562–63 (App. Div. 1978) (foster agency has "discretionary authority . . . to remove the children from the foster home

whenever it was deemed appropriate"). The requirement that the agency make a determination that a child faces a safety risk is likewise of a "judicial nature." That term has been interpreted, for example, to encompass an informal suspension of an officer for suspected misconduct, *see Bilbili*, 2005 WL 1397016 at *11, or the issuance of a utility shutoff order, *Lee*, 232 N.J. at 124 n.1.

Furthermore, DCPP clearly has a "broad range of discretion in investigating and resolving" foster placements, and is not "required to follow a prescribed course of action by law." *Lee*, 232 N.J. at 124 n.1. DCPP's removal of Alison is at least as discretionary as the administrative action of an emergency electricity shutoff in *Lee*. It follows that the DCF defendants' actions in furtherance of their discretionary decision *not* to remove Alison are similarly protected as exercises of discretion. *Kolitch*, 100 N.J. at 495–96 ("acting on the decision to set a certain [speed] limit" such as "posting of a sign" is "a decision that is discretionary in nature and therefore entitled to immunity . . . . both the decision and the act of implementation are one and the same for the purposes of the statute"); *cf. Lee*, 232 N.J. at 124 (inspector failed to ask supervisor to issue emergency shutoff was a component of a discretionary decision not to shut off power).

If *Lee* was interpreting subsection (b), then, it would support a conclusion that the DCF defendants' actions in this case were properly analyzed under that provision, and would suggest that the immunity is applicable to their conduct. Based on that view of *Lee,* I would grant summary judgment.

Recall, however, that the foregoing analyzed one of two alternatives. The other alternative is that *Lee* was *not* specifically applying subsection (b), but rather announcing a new interpretation of the more general immunity provisions of section (a), N.J. Stat. Ann. § 59:3-2(a) and 59:2-3(a). On that alternative view of *Lee,* I must ask whether Ms. Cordero and Ms. Moody were

(1) required to act "in a prescribed manner in obedience to the mandate of legal authority, without regard to or the exercise of [their] own judgment upon the propriety of the act being done," *S.P.*, 428 N.J. Super. at 231 (quoting *Morey v. Palmer*, 232 N.J. Super. 144, 151 (App. Div. 1989), or, rather,

(2) empowered to "exercise . . . personal deliberations and judgment, which in turn entail[ed] examining the facts, reaching reasoned conclusions, and acting on them in a way not specifically directed," *id.* at 230 (quoting *Kolitch*, 100 N.J. at 495).

That is not a close question; our case falls under alternative (2). Ms. Cordero and Ms. Moody possessed broad authority to remove Alison from the foster home upon determining that she was at risk, on an emergent basis, without court intervention. They were empowered to exercise that discretion based on their personal deliberations and the reasoned conclusions resulting from those deliberations. So, even assuming that *Lee* was a subsection (a) case, Ms. Cordero and Ms. Moody plainly engaged in discretionary decision making.

As to the common law claims against Ms. Cordero and Ms. Moody, summary judgment is granted pursuant to the discretionary immunity provision of the NJTCA.

### C. Conclusion: DCF Defendants

Summary judgment is denied as to the Section 1983 and N.J. Stat. Ann. § 10:6-2 claims against Ms. Cordero and Ms. Moody. In all other respects, summary judgment is granted in the DCF defendants' favor.

## V. CARAS DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff asserts essentially the same claims against the CARAS defendants: namely, that they ignored signs that Alison was being abused or neglected by her foster parents. Specifically, plaintiff alleges that, when Alison struck her head on a bookshelf and Ms. Lazala-Krohn did not take her to the hospital, Ms. Avila "blatantly ignored" that fact and instead "just told [Lazala-Krohn] not to do it again." (DE 182 at 2.) Plaintiff claims that if this violation "had been reported earlier by Avila and her supervisors . . . an investigation of

these resource parents would have ensued much earlier and Alison would have been removed from that home and would still be alive today." (*Id.*)

Plaintiff also cites evidence that the foster parents were "overwhelmed with having to care for five children ages five to sixteen months" and says that the CARAS defendants "should have [brought this] to the attention of the licensing unit [so] the placement could have been reviewed." *Id.* Plaintiff brings these claims under 42 U.S.C. § 1983, the New Jersey Civil Rights Act, and New Jersey common law. I will **GRANT** summary judgment to the CARAS defendants and dismiss those claims.

### A. Section 1983 and the New Jersey Civil Rights Act

#### 1. Kean and CARAS

At the outset, I note that Kean and CARAS are not proper subjects of a suit under Section 1983 or N.J. Stat. Ann. § 10:6-2(c). "States are not 'persons' within the meaning of § 1983 and, therefore, cannot be among those held liable for violations of the civil rights statute." *Blanciak*, 77 F.3d at 697. Excluded entities include "state agents and state instrumentalities" which, depending on the "nature of the entity created by state law," should be "treated as an arm of the State." *Regents of the Univ. of Cal.*, 519 U.S. at 429–30. Thus, New Jersey state agencies are immune from 1983 claims unless their Eleventh Amendment immunity has been waived. *See O'Bryant v. NJDCPP*, 818 F. App'x 143, 147 (3d Cir. 2020).

The same holds true under N.J. Stat. Ann. § 10:6-2(c), which mirrors the language of § 1983 and, for good measure, is accompanied by New Jersey's statutory definition of "person," which applies to the State only "when used to designate the owner of property which may be the subject of an offense." *Didiano*, 488 F. App'x at 638. The Third Circuit has thus concluded that the New Jersey Civil Rights Act does not grant a cause of action against New Jersey or arms of the state. *Id.* at 638–39; *see also Evans*, 2016 U.S. Dist. LEXIS 62070 at *23 (same).

New Jersey state colleges, including Kean, are arms of the State. *Skoorka v. Kean Univ.*, 2007 WL 2460160 at \*14–16 (App. Div. Aug. 30, 2007) ("Kean is an arm of the State"); *Alston v. Kean Univ.*, 549 F. App'x 86, 89 (3d Cir. 2013) ("it would have been futile for Alston to amend his complaint" "to assert claims against Kean arising under the Fourteenth Amendment" because "the Eleventh Amendment would still bar" a 1983 claim); *see also Jones v. Pi Kappa Alpha Int'l Fraternity, Inc.*, 765 F. App'x 802, 806–08 (3d Cir. 2019); *Maliandi v. Montclair State Univ.*, 845 F.3d 77 (3d Cir. 2016). Kean is thus not subject to suit under these statutes.

Since Kean is not subject to suit, CARAS is not, either. CARAS is a subentity within Kean, and any judgment against Caras would, for all intents and purposes, be a judgment against Kean, and therefore a judgment against New Jersey. A suit against CARAS is therefore barred by the Eleventh Amendment to the same extent as a suit against Kean. *See Alston*, 549 F. App'x at 89.

## 2. Cerda and Avila

Although Kean and CARAS are not "persons" under the civil rights statutes, Avila and Cerda, sued in their personal capacities, are. *See Estate of Lagano v. Bergen Cnty. Prosecutor's Office*, 769 F.3d 850, 856 (3d Cir. 2014). I will therefore further consider the merits of plaintiff's claims in relation to Avila and Cerda. As discussed in my analysis of DCF's motion for summary judgment, to make out a claim under § 1983 and the New Jersey Civil Rights Act, a plaintiff must show two things: (1) a violation of a constitutional right, and (2) that the right in question was clearly established at the time of the alleged misconduct. *James*, 700 F.3d at 679.

I conclude that plaintiff has not made out a claim against Cerda and Avila for violating her constitutional rights. Plaintiff asserts a claim based on the Fourteenth Amendment's Due Process Clause, particularly the due process right to personal bodily integrity. (DE 182 at 4.) Citing *Nicini v. Morra*, plaintiffs argues that "when the State places a child in State-regulated foster care, the

state has entered into a special relationship with that child which imposes upon it certain affirmative duties." (*Id.* at 5 (quoting *Nicini*, 212 F.3d at 808).)

Discussing a parallel claim, I have already concluded that the DCF defendants entered into such a special relationship with Alison. *See* Section IV.A.2., *supra*. But one state actor's entry into a special relationship with an individual does not mean that all state actors have done so. *Cf. Waubanascum v. Shawano County*, 416 F.3d 658, 665–66 (7th Cir. 2005) (rejecting special relationship where ("Menominee County, not Shawano County, had custody over Waubanascum" and so liability could not attach to Shawano County). I must therefore determine if the CARAS defendants, in particular, had a special relationship with Alison such that the federal or state constitution imposed a duty to keep her safe from known risks.

I conclude that the CARAS defendants did not have such a relationship with Alison, because they did not have custody of her, and were not the ones with the authority or responsibility to remove her from the foster home. *Nicini* explained that the defendant would acquire such a responsibility only by virtue of some act of assumption:

> A relationship between the state and foster children arises out of the state's affirmative act in finding the children and placing them with state-approved families. By so doing, the state assumes an important continuing, if not immediate, responsibility for the child's well-being. In addition, the child's placement renders him or her dependent upon the state, through the foster family, to meet the child's basic needs.

212 F.3d at 808 (quoting *D.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364, 1372 (3d Cir. 1992)). Thus, *Nicini* emphasized the state's "affirmative act" in finding and placing the children, and the child's subsequent dependence on the state, as giving rise to responsibility for the child's wellbeing. *Nicini* further discussed *DeShaney v. Winnebago County Dep't of Soc. Servs.*, noting that in that case the state was not held liable for failing to remove a child from the custody of his abusive biological father, despite the agency's knowledge of the abuse. *Nicini*, 212 F.3d at 806–07 (quoting

*DeShaney*, 489 U.S. 189, 195 (1989)). Crucial to the Supreme Court's decision was Justice Rehnquist's conclusion that "had the State by the affirmative exercise of its power removed [DeShaney] from free society and placed him in a foster home operated by its agents, we might have a situation sufficiently analogous to incarceration or institutionalization to give rise to an affirmative duty to protect," but because "the State [was merely] aware of the dangers that [DeShaney] faced in the free world [but] played no part in their creation, nor did it do anything to render him more vulnerable to them," the State bore him no "affirmative duty to protect." 212 F.3d at 807 (quoting *DeShaney*, 489 U.S. at 201 & n.9); *see also Morrow v. Balaski*, 719 F.3d 160, 168 (3d Cir. 2013) ("any [special] relationship 'arises not from the State's knowledge of the individual's predicament or from its expressions of intent to help him, but from the limitation which it has imposed on his freedom to act on his own behalf'") (quoting *DeShaney*, 489 U.S. at 200) (rejecting asserted special relationship between schools and students). Ultimately, "it is the State's affirmative act of restraining the individual's freedom to act on his own behalf—through incarceration, institutionalization, *or other similar restraint of personal liberty*— which is the 'deprivation' of liberty' triggering the protections of the Due Process Clause, not its failure to act to protect his liberty interests against harms inflicted by other means." *Morrow*, 719 F.3d at 168 (quoting *DeShaney*, 489 U.S. at 200) (emphasis in *Morrow*).

Thus, Avila and Cerda, as employees of CARAS, would have a special relationship with Alison only if they had been responsible for removing Alison from her biological parents and placing her in an environment where CARAS maintained some ongoing supervisory responsibility. But if Avila and Cerda were no more than simply *aware* of abuse occurring while Alison was in the custody of DCPP, there would be no constitutional claim against them.

Here, the undisputed facts make it clear that the latter is the case, and that Avila and Cerda did not stand in any special relationship with Alison. It is not disputed that DCPP, not CARAS, obtained custody over Alison and her

siblings, removed them from their home, and placed them with the foster family. (DE 182 at 19 ("Ms. Avila was very clear in her deposition that CARAS played no role in the placement of children in their homes. That decision was made by the DCPP who would talk to the family, talk about the placement and bring the children to the foster family"); DCF SOMF ¶ 1–3; Pl. DCFRSOMF ¶ 1–3 ("Agreed").) It is not disputed that the New Jersey State Judge, James Hely, J.S.C., ordered that the children were under the "custody, care, and supervision of [DCPP]," which performed all of the actions which normally give rise to a special relationship.

Nor was CARAS obligated, or even empowered, to take any actions which theoretically would create a special relationship. CARAS is a non-profit entity within the Kean University system which recruited Spanish-speaking foster families. (CARAS SOMF ¶ 12.) It was compensated for those services by DCF. (*Id.* ¶ 13.) The roles of Avila and Cerda were to assist the foster parents in completing their training and becoming licensed in the foster system. (Pl. Supp. CARASSOMF ¶ 2.) Each was to serve as "contact person and [their] main goal was to see if [the foster homes] had the space, the capacity in their home and if they met the requirements from the office of licensing." (*Id.*) Avila explained that CARAS's normal response to a foster parent's violation of the foster rules would be to create a corrective plan of action and inform DCPP, but that it would be up to the Division to determine if the children needed to be removed. (*Id.* ¶ 25.) She further explained that she believed that it was DCPP's obligation to investigate children in placement and that indeed, CARAS workers "were not allowed to investigate regarding to the children in placement." (*Id.* ¶ 29; DE 189-19 (Ex. Q to Pl. Opp. to DCF MSJ, Dep. Tr. of Ms. Avila at 178:1–4).) Thus the CARAS defendants were not empowered to exert the sort of control over Alison that would create a custodial relationship.

The facts of this case make clear why the custody requirement of the special relationship analysis is so crucial. Even assuming the CARAS defendants believed Alison was at risk in the foster home, they had no authority to correct the situation. CARAS had no ability to remove Alison from

the home, or to compel DCPP to do so. DCPP, the agency with authority, was aware of the same facts as CARAS but decided not to remove Alison.

The question is not one of moral blame, or whether the individuals involved could have done more for Alison; it is whether there is a constitutional claim here. There was no "special relationship" between CARAS and the children because DCF/ DCPP, not CARAS, had custody and control over the children. I thus find plaintiff has not made out a constitutional claim against the CARAS defendants.

## B. Claims Under New Jersey Common Law and the Application of the New Jersey Charitable Immunity Act

The New Jersey Charitable Immunity Act ("NJCIA") bars negligence claims against nonprofits "organized exclusively for religious, charitable, or educational purposes," as well as their "employees, agents, servants or volunteers." N.J. Stat. Ann. § 2A:53-7(a). It is well settled that the NJCIA applies to New Jersey State colleges such as Kean. *See O'Connell v. State*, 7085 A.2d 857, 866 (N.J. 2002) ("State colleges plainly meet the statutory definition of a charitable institution under the CIA—a 'nonprofit corporation . . . organized exclusively for . . . educational purposes.") (quoting N.J. Stat. Ann. § 2A:53A-7a).

To establish immunity under the CIA, an entity must show "(1) [it] was formed for nonprofit purposes; (2) [it] is organized exclusively for religious, charitable or educational purposes; and (3) [it] was promoting such objectives and purposes at the time of the injury to plaintiff who was then a beneficiary of the charitable works." *Green v. Monmouth University*, 206 A.2d 394, 403 (N.J. 2019). The parties do not dispute the first two prongs. (CARAS SOMF ¶¶ 1–2, 9–15; Pl's CARASRSOMF ¶¶ 1–2, 9–15 ("Agreed").) Plaintiff, however, asserts that Alison was not a "beneficiary" of CARAS's good works because CARAS was created to recruit foster parents and help foster parents qualify as resource parents under the state system, not to place foster children in foster homes. (DE 182 at 19.) Plaintiff asserts that because CARAS's role was limited to

serving the foster parents, the foster parents, not Alison, were the beneficiaries of the organization's good works. (*Id.* at 20.) This argument fails to persuade, because "beneficiary" is defined broadly.

The "beneficiary" prong involves "two inquiries." *Green*, 206 A.3d at 403. The first is whether "the organization pleading the immunity, at the time in question, 'was engaged in the performance of the . . . objectives it was organized to advance.'" *Id.* (quoting *Ryan v. Holy Trinity Evangelical Lutheran Church*, 175 N.J. 333, 350 (N.J. 2003)). The parties again do not dispute that the CARAS defendants satisfy the first inquiry; indeed, they plainly do, because the CARAS defendants are only involved in this case because of their recruitment, monitoring, and supervision of the Spanish-speaking foster parents who took care of Alison, acts that fall squarely within CARAS's charitable objectives.

The second inquiry is whether "the injured party [was] a direct recipient of those good works," *i.e.,* a "beneficiary." *Id.* (quoting *Ryan*, 175 N.J. at 350). The term "beneficiary" is "'. . . to be interpreted broadly, as evidenced by the use of the words 'to whatever degree' modifying the word 'beneficiary' in the [CIA].'" *Id.* at 406 (quoting *Ryan*, 175 N.J. at 353). To be considered a *non-*beneficiary, a person or entity must be "'unconcerned in and unrelated to' the benefactions of such an organization." *Id.* Thus, if a plaintiff's "'presence was clearly incident to accomplishment' of the defendant's charitable purposes," *id.* (quoting *Bieker v. Cmty. House of Moorestown*, 169 N.J. 167, 180 (N.J. 2001)), then the plaintiff was a beneficiary.

Thus, New Jersey courts have found a three-year-old was a recipient of a community center's benefactions where he was present solely as a spectator of his father's basketball game. *Id.* (citing *Bieker*, 169 N.J. at 180). So were a spectator at a Little League baseball game, a woman who accompanied her husband to a historical society library to "keep him company and enjoy an automobile ride," and a wedding guest at a church. *Id.* at 406–07 (cleaned up). In *Green*, the New Jersey Supreme Court concluded that an individual who

bought a ticket to attend a country music concert at Monmouth University was a beneficiary of the university's decision to hold concerts in order to enrich student life, even though the individual was not a student herself. *Id.* at 408.

It is true that CARAS's duty was primarily to recruit, educate, qualify and monitor the foster parents. The foster children, however, including Alison, were clearly present in the foster home "incident to [the] accomplishment" of that charitable purpose. A person cannot be a foster parent, after all, without a foster child, and the entire mission of the foster care system is to serve the needs of children. I therefore find that charitable immunity applies to immunize the CARAS defendants against plaintiff's common law claims, and requires the grant of summary judgment as to those claims.

In summary, I **GRANT** the CARAS defendants' summary judgment motion in its entirety and dismiss them from the case.

## VI.    DR. KISHEN'S MOTION FOR SUMMARY JUDGMENT AGAINST THE DCF DEFENDANTS' THIRD-PARTY CLAIMS

Finally, I consider Dr. Kishen's motion for summary judgment on the third-party complaint filed against her by the DCF defendants. Dr. Kishen claims that summary judgment is proper because the claims, however labeled, sound in medical malpractice, and therefore would require that the relevant standard of care be established by an Affidavit of Merit and expert testimony. There being no such expert opinion, I agree that summary judgment must be **GRANTED** in favor of Dr. Kishen.

### A. Background

As described above, Dr. Kishen examined Alison on two separate occasions. On the second occasion, she noted bruising on Alison's body and an abrasion on her lip. Dr. Kishen then contacted Mr. Henningsen and left him a voicemail. In the voicemail, she said she needed to speak with Henningsen, but that it was not urgent.

The parties dispute whether Dr. Kishen left that voicemail because she believed that Alison was being abused, or whether she was merely calling to get

Alison's medical records. Dr. Kishen testified in her deposition that she was merely seeking medical records. (DE 166-4 Dep. Tr. Dr. Kishen T68:19–69:3.) DCPP's IAIU inspectors, however, claim that Kishen told them that she made the call because she suspected abuse. (Pl. DCFRSOMF ¶¶ 45–46.) Dr. Kishen denies having ever said that. (DE 166-4 Dep. Tr. Dr. Kishen T69:2–3.) It is undisputed that Dr. Kishen never followed up on the call and never called the New Jersey hotline for reporting abuse.

Dr. Kishen testified in her deposition that she did not believe Alison's injuries indicated abuse because she had evaluated other children in the family who did not display any indications of abuse. (*Id.* T56:24–56:4.) She further testified that the foster parents had given a good explanation for Alison's bruising, *i.e.,* that at a recent Halloween party Alison had been carried around by a number of adults who may have bumped her. (*Id.* T55:4–9.)

Plaintiffs allege that Dr. Kishen was negligent in failing to identify Alison's abuse and report it to DCPP. They cite N.J. Stat. Ann. § 9:6-8.10, which imposes upon all adults a duty to report a reasonable suspicion of child abuse. I conclude that, under the particular circumstances of this case, they have not established a violation of the statute because they have failed to provide expert testimony establishing Dr. Kishen's duty of care.

### B. DCF Defendants' Negligence Claims and N.J. Stat. Ann. § 9:6-8.10

"The fundamental elements of a negligence claim are a duty of care owed by the defendant to the plaintiff, a breach of that duty by the defendant, injury to the plaintiff proximately caused by the breach, and damages." *G.A.-H v. K.G.G.*, 238 N.J. 401, 413 (N.J. 2019) (quoting *Robinson v. Vivirito*, 217 N.J. 199, 208 (N.J. 2014). On a motion for summary judgment, the non-moving party "may not rest upon the mere allegations or denials of his pleading," "but must produce sufficient evidence to support a jury verdict in his favor." *Kempf v. Target Corp.*, 2008 U.S. Dist. LEXIS 7326 at *4–5 (D.N.J. Jan. 31, 2008) (quoting *Celotex*, 477 U.S. at 330). This obligation to produce evidence which would sustain a jury verdict is also known as a "burden of production." *Id.* at 4.

To meet their burden of production, then, DCF defendants must produce evidence which could sustain a jury verdict on the issues of duty of care, breach, proximate cause, and damages.

Dr. Kishen asserts that this is equivalent to a professional malpractice case, requiring expert testimony. Indeed, under New Jersey law, a malpractice plaintiff must produce an Affidavit of Merit at the outset of the action, or face dismissal. The affidavit is a statement by an expert that the defendant professional breached an applicable duty of care. N.J. Stat. Ann. § 2A:53A-27. *See generally Ryan v. Renny*, 203 N.J. 37 (2010); *Szemple v. Univ. of Med. & Dentistry of New Jersey*, 162 F. Supp. 3d 423, 426 (D.N.J. 2016). Dr. Kishen argues that no such expert affidavit has been filed, and that the plaintiffs have therefore failed to meet their burden of production for purposes of summary judgment.

The DCF defendants counter that they can meet their burden of production by relying on N.J. Stat. Ann. § 9:6-8.10. They distinguish their claim from a medical malpractice suit; they say they are not claiming Dr. Kishen was negligent in the discharge of her professional standard of care as a doctor, but rather that she was negligent in the ordinary sense, because she violated N.J. Stat. Ann. § 9:6-8.10, which imposes a duty of reporting on every adult. No expert testimony, they say, is required to prove a violation of that statute, which applies to both professionals and non-professionals.

N.J. Stat. Ann. § 9:6-8.10, *Report of Abuse*, provides as follows:

Any person having reasonable cause to believe that a child has been subjected to child abuse, including sexual abuse, or acts of child abuse shall report the same immediately to the Division of Child Protection and Permanency by telephone or otherwise.

Such reports, where possible, shall contain the names and addresses of the child and his parent, guardian, or other person having custody and control of the child and, if known, the child's age, the nature and possible extent of the child's injuries, abuse or maltreatment, including any evidence of previous injuries, abuse or maltreatment, and any other information that the person believes may be helpful with respect to the child abuse and the identity of the perpetrator.

Thus, the statute requires "any person," not just a doctor, teacher, or other childcare professional, to "report" if they have "reasonable cause" to believe that a child is being subject to abuse.

A violation of N.J. Stat. Ann. § 9:6-8.10 is proffered in satisfaction of the DCF defendants' burden of production regarding Dr. Kishen's negligence. Such a statutory violation might support a claim in any one of three ways: the statute may create civil liability by its provisions, a violation may constitute negligence *per se*, or a violation may constitute evidence of negligence. Here, N.J. Stat. Ann. § 9:6-8.10 does not expressly create civil liability. Nor does it constitute negligence *per se,* because this statute does not "specifically incorporate the non-statutory or common-law standard" of negligence. *See J.S. v. R.T.H.*, 155 N.J. 330, 348 (N.J. 1998) (violation of N.J. Stat. Ann. § 9:6-8.10 is not negligence per se because it "does not purport to incorporate or codify any common-law standard" or "expressly attempt to resolve for purposes of civil liability the comparative interests of the parties").

A violation of N.J. Stat. Ann. § 9:6-8.10 may nevertheless serve as evidence of negligence because the "protections provided, the evils addressed, and the obligations imposed by the reporting statute parallel those that would be relevant in recognizing the existence of a duty as a basis for a civil remedy." *Id.* at 349 (holding a violation of N.J. Stat. Ann. § 9:6-8.10 constitutes evidence of negligence). New Jersey courts have thus held that N.J. Stat. Ann. § 9:6-8.10 furnishes a standard of care for negligence claims based on a failure to report child abuse. *See L.A. v. DYFS*, 217 N.J. 311, 331–32 (N.J. 2014) (N.J. Stat. Ann. § 9:6-8.10 provides standard of care for negligence claim based on failure to report); *J.D. v. Maggaulli*, 2015 WL 4164809 at *5 (App. Div. July 13, 2015) (N.J. Stat. Ann. § 9:6-8.10 provides standard of care); *Cf. Baksh v. Patel*, 2014 N.J. Super. Unpub. LEXIS 992 at *4–5 (App. Div. May 1, 2014) (proving violation of statute carries burden of production for standard of care) (citing *Reynolds v. Gonzalez*, 172 N.J. 266, 284 (N.J. 2002)).

I therefore agree with the DCF defendants that proof of a violation of N.J. Stat. Ann. § 9:6-8.10, as evidence on the issue of a duty of care, could satisfy their burden of production. "[T]he standard set forth in N.J. Stat. Ann. § 9:6-8.10," namely, the "reasonable cause to believe" standard, "is presently intended to apply to physicians." *L.A.*, 217 N.J. at 330. The standard

> requires a reasonable belief based on the facts and circumstances known to the person on the scene. The reasonableness of forming that belief, or . . . not forming that belief, must be tested based on the circumstances of the case and requires an individualized assessment of what the person on the scene observed and discerned. <u>In that review, the actions of the person on the scene must be objectively reasonable given the facts and circumstances known to that person</u>.

*Id.* at 327–28 (emphasis added). The New Jersey Supreme Court went on to explain that "the facts and circumstances known to" a person must take into account that person's background:

> That statutory duty to report child abuse requires a reasonable belief based on the facts and circumstances known to the person on the scene. In other words, was it reasonable for the person who must decide whether to report to believe that abuse has occurred, <u>taking into account the background of that person and the facts and circumstances known to him or her at the time</u>?

*Id.* at 331 (emphasis added). Making itself even more clear, the Court then applied its consideration of the "background" of a person to an emergency room doctor:

> Dr. Yu therefore was required to report S.A.'s emergency room treatment to DYFS if, objectively viewing the circumstances of the child's admittance, <u>an emergency medicine specialist involved in handling this treatment should have believed</u> that S.A.'s parents or guardians had been reckless or grossly negligent in supervising her or in allowing her access and/or consume the cologne.

*Id.* at 333. Thus, it is clear that while the "reasonable cause" standard applies to doctors and ordinary individuals alike, the "reasonable cause" analysis for a doctor differs from the analysis for an ordinary individual because a doctor is required under the statute to exercise reasonable *medical* judgment in

determining the possibility of abuse. *See Maggaulli*, 2015 WL 4164809 at *5 (N.J. App. Div. July 13, 2015) (claim against doctor under N.J. Stat. Ann. § 9:6-8.10 analyzed as a medical malpractice claim); *Zelnick v. Morristown-Beard School*, 445 N.J. Super. 250, 263–64 (Law. Div. 2015) (expert testimony required to prove claim against school official for failure to report possibility of abuse under N.J. Stat. Ann. § 9:6-8.10).

In a true malpractice case, a medical doctor's standard of care is "so esoteric that jurors of common knowledge and experience cannot form a valid judgment as to whether the conduct of a party was reasonable." *Zelnick*, 445 N.J. Super. at 263 (quoting *Butler v. Acme Markets, Inc.*, 89 N.J. 270, 283 (N.J. 1982)). That is why an Affidavit of Merit and, ultimately, expert testimony is required. *Id.*; *see also Scott v. Calpin*, 527 F. App'x 123, 126 n.3 (3d Cir. 2013) ("the plaintiff in a . . . malpractice action bears the burden to establish the appropriate standard of care with expert evidence" unless "the lack of skill is so obvious as to be within the range of the ordinary experience and comprehension of non-professional persons) (quoting *Lentino v. Fringe Employee Plans, Inc.*, 611 F.2d 474, 481 (3d Cir. 1979)).

To excuse the requirement of an expert affidavit, the DCF defendants rely on *Carter v. Estate of Lewis*, 2011 WL 1885953 (D.N.J. 2011). There, the plaintiff alleged that a psychologist was negligent in failing to report child abuse. *Id.* at 1. The psychologist responded that plaintiff was required to produce an Affidavit of Merit. *Id.* at 3. *Carter* held that on these facts, no Affidavit of Merit was required, because under N.J. Stat. Ann. § 9:6-8.10, "professional persons, including psychologists, are not held to a higher reporting standard in reporting child abuse." *Id.* at 3. As a result, it concluded the "[p]laintiff does not need to prove a deviation from the professional standard of care of a licensed psychologist," because "the statute applies to any individual who has 'reasonable cause' to suspect that a child has been abused." *Id.* As a result, the court held, a jury could determine whether or not

the psychologist had reasonable cause without considering whether the psychologist had been negligent in his role as a psychologist.

It is true that *Carter* was decided before *L.A.* clarified that the standard under N.J. Stat. Ann. § 9:6-8.10 takes into account a defendant's professional status in determining whether or not there was "reasonable cause" to suspect abuse. I believe, however, that *Carter* continues to maintain some vitality. The import of *L.A.,* as I read it, is that a medical professional *may* be held to a higher standard, in addition to the generally applicable one. A doctor, for example, might be expected to observe and interpret symptoms that would not be so observed or so understood by a lay person.

That the defendant is a doctor is not dispositive, however. For example, the malpractice requirements would not apply in an action not brought against a doctor in that person's medical capacity. And even in a medical malpractice case, the law will excuse the requirement of expert testimony where the "issue of responsibility is . . . a matter of common knowledge . . . within the ken of a layperson." *Farrell v. Janik*, 225 N.J. Super. 282, 289 (Law. Div. 1988) For instance, in *Hubbard v. Reed*, a dentist pulled the wrong tooth out of a patient's mouth, and the court concluded that it "has long been settled that pulling the wrong tooth is negligent as a matter of common knowledge." 168 N.J. 387, 396 (N.J. 2001). Similarly, in *Palanque v. Lambert-Wooley*, a doctor misread two pregnancy tests, which appeared to give the result that the plaintiff had 1145 and 1421 MIU/ML, which indicates that the plaintiff had an ectopic pregnancy. 168 N.J. 398, 400 (N.J. 2001). In fact, 1145 and 1421 were not the plaintiff's test results, but rather the identification numbers for the two pregnancy tests on the laboratory report. *Id.* at 400–01. The court concluded that it was "quite obvious" that the doctor's misreading of the report had been "careless" and so no expert testimony was required to establish negligence. *Id.* at 406. Even though these cases involved suits against a doctor, they did not implicate medical judgment, so they proceeded in the manner of normal negligence claims.

To be sure, then, one kind of failure-to-report case may be brought against a physician *via* what amounts to a claim of professional malpractice. I believe that *L.A.* also leaves room, however, for a claim against a person who happens to be a physician but violates the ordinary standard of care for reporting abuse that applies to everyone. Again, I suggest an obvious example for purposes of illustration: A physician who actually observed an act of child abuse could probably be held liable without the need for expert testimony. Liability in such a case would not depend on whether it was the doctor or her receptionist who observed the abuse, because the existence of a duty under N.J. Stat. Ann. § 9:6-8.10 would not implicate any specialized expertise. So I conclude, at least *arguendo,* that there exists a claim under N.J. Stat. Ann. § 9:6-8.10 that could succeed against Dr. Kishen without expert testimony.

The question, then, comes down to whether this case truly *is* a malpractice case, and particularly one in which the fact finder is called upon to apply a specialized standard of care which must be established by expert testimony. I conclude that it is.

DCF defendants essentially claim that Dr. Kishen was negligent when, in the course of conducting a medical examination on Alison, she did not infer from bruising on Alison's body and an abrasion on her upper lip that Alison was being abused. Whether Dr. Kishen should have made such an inference, however, is shot through with questions of medical judgment. As Dr. Kishen explained in her deposition, her medical training teaches her to engage in the following evaluative process to identify signs of abuse:

> Basically, you would be, first of all, you would see how the child looks like, what the reason of the visit is, who the child was accompanied by.
>
> And again, depending on the age, if it's a newborn baby or toddler or infant, you're looking for, say it's a newborn baby and you see bruises that are unexplainable on a small baby, or if it's a lethargic baby who's got a scab, abrasion, or blue and black eye or has ligature marks or, you know, is malnourished, any of these things can trigger multiple questions from the person who brings the

child to the office, and then you would investigate further from there . . . .

[Y]ou would get a history to find out from the parent the provider the reason for the visit and what, and to ask them how the injury had happened.

(DE 166-4, Ex. 1 Dep. Tr. of Dr. Anita Kishen (1T23:10–24:4.).[18] Thus, as Dr. Kishen explains, her medical training directs her to evaluate children for bruises, lethargy, abrasions, black eyes, ligature marks, or malnourishment; and then determine whether those conditions or injuries are unexplainable based on the child's age and level of activity; then ask questions of the caretaker and evaluate whether the caretaker's explanations are sufficient. Dr. Kishen applied that training to Alison, noting that she presented with

[A] [b]ruise on the R temporal area X2 small bruise on X1 shoulder and left shoulder area . . . Small superficial abrasion on the upper lip URI/OM/bruise (probably accidental).

(DE 166-4 Ex. 4.) As Doctor Kishen explained in her deposition, "X2" means two bruises; she explained that those bruises were "very small, very tiny." (1T53:5–13.) She also noted that she had evaluated Alison a week before this sick visit and noted that she did not see "any bruising or abrasions or anything like that." (*Id.* 1T:47:23–24.)

Dr. Kishen explained in her deposition that Ms. Lazala-Krohn had explained that they had "a party at home and Alison was carried by the guests in the house, and I think she must have bumped something somewhere." (1T52:14–20.) As Dr. Kishen later explained, she evaluated that explanation along with other information, such as her familiarity with Lazala-Krohn from having treated several of her foster children over the years, and her familiarity

---

[18] It is possible, of course, that Dr. Kishen misstated or misconceived the medical process for determining whether a child was suffering from abuse, but absent expert testimony there is no way for a fact finder to determine whether that is the case. *Cowley v. Virtua Health Sys.*, 242 N.J. 1, 19 (N.J. 2020) ("[A] jury of laymen cannot be allowed to speculate as to whether the procedure followed by a [defendant professional] conformed to the required professional standards.") (quoting *Schueler v. Strelinger*, 43 N.J. 330, 345 (N.J. 1964)).

with the medical records of Alison's siblings, who did not present with signs of abuse. (*Id.* 1T28:12–25; 31:2–19.) She thus regarded the foster mother's explanation for the injury as "pretty good" and not indicative of abuse, reasoning that she "knew [Lazala-Krohn], she told me, and this, this child was, she sort of seemed like she's looked after children so many times, and we saw the other kids in the family, and so I really didn't think there was anything to be worried about." (1T56:24–57:4.)

Dr. Kishen thus applied her medical judgment to Alison's injuries and Ms. Lazala-Krohn's explanations. She used her experience and training as a doctor to identify the signs of abuse and evaluate Lazala-Krohn's explanations. I find this case therefore implicates her medical judgment and so her conduct must be judged under the standard of a medical professional.

The evidence does not suggest that Alison's bruises and superficial abrasions at the time she saw Dr. Kishen would establish abuse as a matter of "common knowledge." It is plausible that a child carried around during a Halloween party might bump a wall or door. I note also that Alison was at an age where she was still unsteady on her feet, and falls are common. That other children in the home did not exhibit signs of abuse does not disprove, but in particular does not advance, the case for a "common knowledge" inference of abuse.

Application of the ordinary standard would not require Dr. Kishen to blind herself to information she learned as a physician, but the evaluation of her application of her expertise requires the input of an expert. As New Jersey courts have made clear, the "common knowledge" exception which permits the application of an ordinary negligence standard against a doctor is "applied narrowly" and only "to cases that 'involve obvious or extreme error.'" *Cowley*, 242 N.J. at 11; *see also id.* at 19 ("Because of the innate complexities of medical malpractice actions, such issues do not usually fall within the common knowledge of an average juror") *Estate of Chin by Chin v. St. Barnabas Med. Ctr.*, 160 N.J. 454, 471 (N.J. 1999); (requiring that the "mistake was obviously

the result of negligence"); *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 580 (3d Cir. 2003) (expert affidavit required unless "defendant's careless acts are quite obvious"). There is good reason for this requirement. Absent expert testimony which gives context to a doctor's decisions, it can be difficult for a jury to fully understand whether a doctor complied with a relevant standard of care.

It cuts both ways. A doctor, by virtue of his or her training, might recognize signs of abuse that would be missed by an untrained observer. But in some instances, a lay person might suspect abuse, whereas a doctor might recognize bruises or lesions as symptoms of illness, or of some form of trauma inconsistent with abuse. Without expert testimony to provide the relevant context, it is difficult for laypersons to know what a doctor could or could not infer based on his or her medical expertise.

There is a secondary rationale, particularly for the AOM requirement, which is ensuring fairness to doctors in defending themselves against what are actually medical malpractice allegations, even if they are phrased as claims of ordinary negligence. The courts will monitor closely the invocation of the "common knowledge" exception in order to ensure that it is not being used to circumvent the requirement of expert evidence. *See Cowley*, 242 N.J. at 21 (rejecting an "approach [which] allows plaintiffs to circumvent the Affidavit of Merit Statute by disguising complex negligence cases with common knowledge allegations as to acts of omission."). Of course, as noted above, there may be instances of abuse that are so obvious that the doctor stands in the shoes of an ordinary lay person, without the need to invoke the doctor's medical judgment. Apart from those "obvious or extreme" cases, however, a plaintiff must come forward with expert testimony to establish a claim against a doctor under N.J.S.A. § 9:6-8.10.[19] The DCF defendants (in their role as plaintiffs) have not

---

[19] The DCF defendants point to evidence that Dr. Kishen actually believed or suspected that Alison had been abused. The IAIU says that Kishen stated that her reason for leaving a voicemail message for Mr. Henningsen was that she suspected abuse. Kishen denies making such a statement. But even resolving that conflict in the

only failed to submit an AOM; they seek to exclude the testimony of Dr. Kishen's proffered expert, who would testify that she complied with her professional standard of care.

The DCF defendants therefore have not met their burden of production, and I will **GRANT** Dr. Kishen's motion for summary judgment on the DCF defendants' third-party claim.

## VII. Conclusion

For the reasons set forth above, I will grant in part and deny in part the DCF defendants' motion for summary judgment, and grant in full the motions for summary judgment filed by the CARAS defendants and Dr. Kishen. The surviving claims are Count 1, Civil Rights Violations – 42 U.S.C. § 1983, against Ms. Cordero and Ms. Moody, and Count 6, Violation of New Jersey's Civil Rights Act and Article I, ¶¶ 5, 7 of New Jersey's Constitution, against Ms. Cordero and Ms. Moody.

Dated: June 24, 2021

/s/ Kevin McNulty

_____

**Kevin McNulty**
**United States District Judge**

---

DCF defendants' favor does not carry their burden. N.J. Stat. Ann. § 9:6-8.10 requires proof of facts that would objectively give rise to a reasonable belief that Alison was being abused. Caution is commendable, but mere suspicions are not enough to give rise to liability.